## Case No. 6,400.

### The HERCULES.

[Brown, Adm. 560;[1] 7 Chi. Leg. News, 419; 21 Int. Rev. Rec. 309; 7 Leg. Gaz. 306.]

District Court, E. D. Michigan. May 31, 1875.

STALE CLAIM—LIMITATION OF ACTIONS AS AGAINST BONA FIDE PURCHASERS WITHOUT NOTICE.

1. Creditors of vessels plying upon the Lakes must enforce their liens, as. against bona fide purchasers without notice, during the current season of navigation, or within such reasonable time after the commencement of the next season as may be necessary to arrest the vessel. Circumstances may occur, which would greatly abridge or lengthen this time.

2. The fact that the former owner of the vessel told the buyer, when purchasing her, that there might be some small claims against the vessel, which he would pay—that he did not know what the claims were, or who held them —would not in the absence of negligence affect the purchaser with knowledge of any particular claim.

3. The fact that the purchaser takes a mortgage upon another vessel, indemnifying him against any claims upon the vessel purchased, does not operate to extend the time within which creditors should pursue their claims, or deprive him of his rights as a bona fide purchaser, without notice.

[Cited in The Bristol, 11 Fed. 164.]

4. Nor can mere notice of the existence of a certain claim affect his rights, unless such notice be had at the time of purchase or of payment.

5. Where a claim accrued in August, 1873, and the libel was not filed until September, 1874, and the vessel in the mean time was easy of access, and several times in the port where the supplies were furnished: *Held*, that as against a person who bought and paid for her

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

in January, without notice of the claim, the lien must be deemed waived.

[Cited in The Theodore Perry, Case No. 13,-879; The Robert Gaskin, 9 Fed. 62; The Rapid Transit, 11 Fed. 335; The J. W. Tucker, 20 Fed. 134.]

On August 13th, 1873, certain fuel was furnished by libellant at Sarnia, in the province of Ontario, to the tug Hercules, then owned by one McCarthy, a resident and citizen of Michigan. No effort was made to enforce collection of the claim during that season, and on the 19th of January, 1874, the tug was sold to William A. Mills and Sarah E. Mills, claimants, resident in Detroit, who paid for her $6,000 in cash, taking a mortgage on the barge Eliza, to indemnify them against any bills that might be outstanding against the Hercules, and which should appear to be liens upon the tug in their hands. Libel was filed on the 10th of September, 1874. No question was made as to the value of the fuel, nor that the same was necessary and was furnished on the credit of the vessel. The answer averred, however, that the claimants were bona fide purchasers of the tug without notice of libellant's claim, and that the same had become stale by reason of his neglect to enforce it. This was practically the only defense set up in the case.

J. C. Donelly, for libellant.
H. H. Swan, for claimants.

BROWN, District Judge. Much discussion is found in the elementary books upon the question, when a claim against a vessel becomes stale as against a bona fide purchaser without notice. So much depends upon the facts and circumstances of each case, that it is exceedingly difficult if not impossible to lay down any general rule applicable even to a particular class of cases. The rule obtaining upon the seaboard, which forbids the libellant pursuing his claim, as against bona fide purchasers, after the end of the voyage next succeeding the contracting of the debt, served a good purpose when applied to the long voyages of sailing vessels, but is ill adapted to the exigencies of steam navigation, and I believe has become practically obsolete. Of course such a rule would be wholly inapplicable to lake navigation. Indeed, the short trips made by vessels here, can hardly be dignified with the name of voyages. Some other rule must be adopted, and it should be so well understood that persons giving credit may know how long it is safe to delay enforcing their claims without prejudice to their rights as against bona fide purchasers without notice. In the case of Stillman v. The Buckeye State [Case No. 13,445], Judge Wilkins, of this district, refused to enforce a claim that had lain dormant for three years, and observed that there was "great reason to limit these tacit liens to the season of navigation, and not to extend their obligation beyond a year. If in the com-

merce of the ocean the lien cannot with propriety be extended, except under special circumstances contradicting the presumption which delay creates, beyond the voyage and the return to the home port where it may be enforced, with equal propriety should a season on the Lakes, embracing the whole year, be conclusive, especially where the right of a purchaser without notice intervened." In the case of The Dubuque [Id. 4,110], my learned predecessor also refused to enforce a lien for wages after three seasons had elapsed, and held as a general rule that "a delay to enforce a maritime lien, after a reasonable opportunity to do so, shall be taken and deemed as a waiver of the same, as against subsequent purchasers or encumbrancers in good faith without notice, unless such delay is satisfactorily explained." I think, however, that this hardly gives sufficient latitude, as a reasonable opportunity may occur within a week by the return of the vessel to the port where the debt was contracted. In the case of The Favorite [Id. 4,696], the district court of Wisconsin refused to enforce a libel for the loss of goods, filed two years and ten months after the loss, and after a bona fide assignee of the bill of lading had seized the boat. The whole subject received an elaborate consideration at the last June term of this court in the case of The Detroit [Id. 3,832], decided by Mr. Justice Swayne. A claim for towage accrued against a vessel in May and June, 1865, while she was in the hands of a person who had contracted to purchase her. Having failed to fulfill his contract, she was returned to her owner, who took her to Canada within a month or two after the services were rendered, where she remained until June 27th of the following year. She was then resold to a bona fide purchaser without notice, who brought her within the jurisdiction of the court, and kept her during the residue of the summer. On October 6th, the libel was filed and the vessel attached. Held, that the lien was waived and that the action could not be entertained. The learned justice says: "In the case of The Buckeye State and The Dubuque a rule applicable to the Lakes is laid down, that where the vessel has passed into the hands of a bona fide purchaser, claims of this character should be prosecuted within the current season of navigation, or at least within a year. I think this rule is founded upon the most solid consideration of good sense."

In fixing the time within which creditors of lake vessels must pursue their claims as against bona fide purchasers, I think it should be borne in mind: (1) That the credit given to vessels for supplies and towage is often extended through the winter following the contracting of the debt, and until the opening of navigation in the spring, though this can hardly be called the general custom. (2) That transfers of vessels are usually made during the winter season. The first consid-

eration will lead the buyer to believe there may be outstanding claims against his vessel, and to protect himself accordingly; the second will induce the creditor to take prompt measures for the collection of his claim after the opening of navigation in the spring.

In view of these facts, I think it reasonable to hold as a rule applicable to vessels plying upon the Lakes, that lien holders should have the current season of navigation to enforce their security, and such reasonable time after the commencement of the next season as may be necessary to arrest the vessel. This would not ordinarily extend the time beyond the 1st of June of the following year. Circumstances, of course, may occur, which would greatly abridge or lengthen this time. If the debt were contracted early in the season, and the vessel were immediately sold with the knowledge of the creditor, it might be inequitable to postpone collection after the close of the current season. If, on the other hand, the debt were contracted late in the season, and the vessel were not readily accessible, a further time might be allowed. Whether it would be the duty of the creditor to pursue the vessel into other districts than his own it is not necessary to determine. Much will depend upon the circumstances of each case.

Applying this rule to the present case, it is clear that, as the debt was contracted in August, 1873, and the libel was not filed until September, 1874, the lien must be deemed waived as against the claimant, unless excusatory circumstances exist, taking the case out of the general rule. Such circumstances are claimed to exist in this case.

1. Although the present owners had no notice of this claim at the time of the purchase, McCarthy did tell them there were a few claims against the vessel of small amount, which he agreed to pay. He also said he did not know what the claims were, or who held them. To ascertain these claims Mr. Mills caused notices to be published for two weeks in two daily papers in Detroit. It would seem, although the evidence on that point is somewhat conflicting, that libellant or his agent had seen this notice or heard of the change of ownership. But whether this be true or not, I do not think the general notice that there were small debts against the tug is sufficient to affect Mills with knowledge of the claim in question, in view of his efforts to ascertain such claims.

2. Although the purchase money was fully paid, there was a mortgage taken on the barge Eliza, to indemnify Mills against any claims which might be outstanding against the tug. There is certainly much force in the argument, that, as the requirement of diligence is solely to prevent injury to innocent third parties, if the court can see that the third party is indemnified and cannot be injured, the rule should not apply. In the case of The Detroit, above mentioned, the collateral guaranty of a third party was taken to secure the purchaser against outstanding claims, and this same consideration was urged upon the learned judge who decided that case. He pronounced it unsound, however, and observed in his decision: "It is held in the authorities upon that subject that the very fact that the vendee accepts a quitclaim deed is strong evidence that he is not a bona fide purchaser, and such I conceive to be the law. I do not understand that a person, by taking the warranty of his vendor, or of a third party, loses the protection of the law applicable to bona fide purchasers." This question did not arise in the case of The Melissa [Case No. 9,400], as the proof showed that the suit was defended in fact by the vendor, and that the claimants had full protection by means of a balance of purchase money still remaining unpaid against the vessel. I see no reason why the remarks made in the case of The Detroit with respect to guaranties are not equally applicable where the guaranty is in the form of a mortgage. The difficulty in libellant's position is this: The mortgage is taken for the protection of the purchaser, and not of the creditor. It is taken, not to extend the time within which claims may be enforced, or to furnish an excuse for delay, but to protect the buyer against claims which may be presented within the time allowed by law. It is, in fact, something with which the creditor has nothing at all to do. To give it weight might involve the buyer in litigations which he would otherwise have avoided. I must hold, therefore, that it has no bearing upon the present case.

3. About the middle of May, 1874, one Hartness, an agent of the libellant, came to A. H. Mills' office in Detroit, and said he had a bill from Mr. Keys against the tug Hercules for wood bought in 1873. In reply Mills told him that the boat had changed hands and he must look to the previous owner. He said he knew she had been sold, and had seen the notice in the paper, and wanted to know where he could find McCarthy. Mills then showed him the barge which was lying opposite Detroit, on the Canadian side of the river, and told him McCarthy, the late owner, was living on board. He said he would go and present the bill, and as he left Mills told him to return and let him know whether the bill was paid or not, and if not, he would see about it. He promised he would, but did not return. I think his conduct was such as to mislead Mills and induce him to believe he no longer looked to him for payment of the claim. Had he at once returned, and upon Mills' refusal to pay libelled the vessel, I should have held his claim still in force.

4. On July 9th, the tug being at Sarnia, the bill was presented to William A. Mills, one of the claimants, who told libellant the boat had been sold, and that he had nothing to do with the bills. He replied he knew it, and had seen it in the paper. Mills then

told him that he was part owner; that he had bought her clear of debt, but that Mc-Carthy and his boat were in Detroit, and that if he would send his bill to the tug office, care of A. H. Mills, McCarthy would straighten it. This was the first intimation that W. A. Mills had of the claim. On July 17th, libellant sent the claim to A. H. Mills, saying, "The captain of the tug Hercules instructed me to send the enclosed draft to you for collection." In reply Capt. Mills wrote him, under date of July 20th, that the "reason that the captain of the Hercules told you to send the draft to me was because Capt. McCarthy was in Detroit at the time with his barge, in dock; also that the Frankfort was there to get a new wheel, and was there for nearly a week; however, if you will send your bill to Mr. McCarthy, if it is correct, he will pay; he is, I consider, an honest man, and has paid all bills that come within his notice," etc. "If you have the draft in Detroit, I could try and see him about it." I do not know that it appears directly that Mills returned the draft in his letter, but such I think is the inference from the facts hereinafter stated. The claim appears to have been soon afterwards placed in the hands of an attorney in Port Huron, with instructions to present it, but not to sue it. After some ineffectual correspondence, he drew a libel and forwarded it to Detroit, September 10th, when this suit was commenced. After the debt was contracted, and during the residue of the season of 1873, the tug was plying upon Detroit river, occasionally stopping at this port. During the season of 1874, and prior to her seizure she was plying between Lake Erie and Lake Huron, and stopped at Sarnia no less than six times, her halts being from half an hour to three hours in length, and always in the day time. McCarthy received $6,000 in cash for her in January, and appears to have been in good credit, with money on deposit in Detroit until July or August. I think it is shown by a preponderance of evidence that libellant knew of the change of ownership shortly after it occurred. It was his duty under the circumstances to act with promptness in proceeding to enforce his lien. He should have filed his libel immediately after his interview with A. H. Mills in May, if not before. It is true that Mills had then, and also in July, notice of this claim, but I do not understand that mere notice can affect the rights of a bona fide purchaser, unless such notice be had at the time of purchase, or of payment. Blanchard v. Tyler, 12 Mich. 339. If any equities at all were raised by reason of the mortgage on the barge Eliza, they ceased by her disappearance from these waters, at or about the time the libel was filed. It would seem that Mills made persistent efforts to find her, and that she was reported lost. Upon the best consideration I have been able to give this case, I think it would be in-

equitable to enforce this lien, and the libel must therefore be dismissed with costs. Libel dismissed.