**ARACHNID, INC.,**
**Plaintiff/Cross–Appellant,**

v.

**MERIT INDUSTRIES, INC.,**
**Defendant/Appellant.**

**Nos. 90–1456, 90–1461.**

United States Court of Appeals,
Federal Circuit.

July 29, 1991.

---

11. See Cribbet, *supra,* at 314–15, for a discus- sion of the reliance concept in recording acts.

Michael T. Hannafan, Michael T. Hannafan & Associates, Ltd., Chicago, Ill., argued, for plaintiff/cross-appellant.

William T. Hangley, Hangley Connolly Epstein Chicco Foxman & Ewing, Philadelphia, Pa., argued, for defendant/appellant. With him on the brief, was Gary A. Rosen. Also on the brief was Leslie L. Kasten, Jr., Panitch Schwarze Jacobs & Nadel, Philadelphia, Pa., of counsel.

Before NIES, Chief Judge, and RICH and MICHEL, Circuit Judges.

RICH, Circuit Judge.

Merit Industries, Inc. (Merit) appeals from the final judgment entered against it on March 20, 1990 (as amended July 2, 1990) by the United States District Court for the Eastern District of Pennsylvania in Civil Action No. 86–1307, assessing money damages for infringement of United States Patent No. 4,516,781 ('781 patent), titled "Dart Game with Two Microcomputers,"

assigned to Arachnid, Inc. (Arachnid). Arachnid cross-appeals from the district court's refusal to submit the issue of damages based on lost profits to the jury. Because we *reverse* the judgment of patent infringement, we do not reach the cross-appeal.

## BACKGROUND

At issue here is the standing of a plaintiff to recover money damages for patent infringement occurring at a time when the plaintiff had a claim of ownership to the patented invention, but did not possess legal title to the patent. The pertinent facts are these: Arachnid, an electronic dart game manufacturer, entered into an agreement with Industrial Design Electronic Associates (IDEA) (not a party here) in 1980, whereby IDEA was to provide consulting services for improvement of the computerized scoring system of Arachnid's dart games. The Arachnid/IDEA consulting agreement provided, *inter alia*, that

> [a]ny inventions conceived by IDEA or its employees ... in the course of the project covered by this agreement, shall be the property of CLIENT [Arachnid], and all rights thereto *will be assigned* by IDEA ... to CLIENT.

(Emphasis added).

Several months after the consulting agreement was terminated, IDEA engineers, on November 17, 1982, filed the application for the '781 patent.[1] Notably, the inventors (IDEA's president Donald DeVale and two other employees) assigned the '781 patent to IDEA, not to Arachnid. The assignment to IDEA, executed November 5, 1982, was recorded in the Patent and Trademark Office (PTO) and the patent was, accordingly, issued to IDEA on May 14, 1985.

In April, 1983, Arachnid amended an existing complaint it had previously filed in the Northern District of Illinois against IDEA for infringement of United States Patent No. 4,057,251 ('251 patent) (not involved here) to include two additional counts: breach of the 1980 consulting agreement, and unjust enrichment in connection with IDEA's use of the dual microprocessor device of the '781 patent. Arachnid sought, *inter alia*, "an assignment of all rights, title, and interest, both legal and equitable" in the application from which the '781 patent later issued. For reasons not entirely clear from the record, the breach of contract and unjust enrichment counts relating to the '781 patent were severed and not tried until April, 1987.

IDEA filed a Chapter 11 bankruptcy petition in February, 1986. IDEA's assets, including the '781 patent, were purchased in December, 1986 by Kidde Recreation Products, Inc. (Kidde), not a party here. Assignment of the '781 patent from IDEA to Kidde was recorded in the PTO.

In April, 1987, a jury in the Arachnid–IDEA litigation (which had by that time been transferred from Illinois to the Western District of Wisconsin, Crabb, J. presiding) found that the invention of the '781 patent had been conceived while IDEA was under contract to Arachnid. In accordance with the jury's verdict, on April 27, 1987, Judge Crabb ordered Kidde (who had been joined as a party) to assign its rights in the '781 patent to Arachnid. Judge Crabb's order included the statement that

> plaintiff Arachnid, Inc. is hereby declared and decreed *to have been and to be* the lawful owner of all right, title, and interest in and to the invention [of the '781 patent]....

(Emphasis added). Kidde appealed the order to assign to this court, which affirmed with an unpublished opinion. *Arachnid, Inc. v. Indus. Design Elec. Assoc., Inc.*, 837 F.2d 1097 (Fed.Cir.1987) (table). In October, 1987, Kidde executed an assignment of "all of its right, title, and interest in and to" the '781 patent to Arachnid. The assignment did not include any assignment of the right to recover for past infringement, nor did it make any reference to the right.

Meanwhile, on May 6, 1985, IDEA had granted a nonexclusive license to Merit to

---

1. The '781 patent discloses and claims a coin-operated electronic dart game that is controlled and scored by two microprocessors. Prior dart games used only one microprocessor.

practice the invention of the '781 patent. Beginning in December, 1985 and ending in June, 1986, Merit manufactured and sold several hundred games utilizing the dual-microprocessor feature disclosed and claimed in the '781 patent. Admittedly, the claims of the '781 patent read on the games sold by Merit, and on this basis Arachnid now seeks to recover damages for infringement from Merit.

In March, 1986, the present lawsuit was brought by Arachnid against Merit in the Eastern District of Pennsylvania. Count one alleged infringement by Merit of the '251 patent. Count two alleged infringement by Merit of the '781 patent, then still owned of record by IDEA, which Arachnid described as "its rightful property" under the 1980 consulting agreement. Arachnid's prayer for relief sought, *inter alia*, "an award of damages together with interest to compensate ARACHNID for MERIT's infringement...."

In response to a motion for partial dismissal by Merit on the ground that Arachnid had failed to state a claim upon which relief could be granted because Arachnid was not the owner of the '781 patent, Arachnid voluntarily dismissed the '781 infringement count without prejudice to later reinstatement.

It was not until June, 1989 that Arachnid amended its complaint in the Pennsylvania action to reinstate the count alleging Merit's infringement of the '781 patent. Arachnid again sought to recover "an award of damages" based on Merit's sales of the dual-microprocessor games in the 1985–86 period.

Before the Pennsylvania district court in a jury trial, Merit continued to dispute Arachnid's standing to sue it for infringement that had occurred in 1985–86, prior to Arachnid obtaining record title to the '781 patent. Alternatively, Merit argued that even if Arachnid had standing to sue for past infringement, Merit was protected from any liability by its license under the '781 patent from IDEA. Both parties moved for a directed verdict on the issue of infringement of the '781 patent.

The Pennsylvania district court granted Arachnid's motion, directing a verdict of infringement by Merit, and denied Merit's motion. No written opinion was issued by the district court, but remarks during trial indicate that the court rejected Merit's lack-of-standing and license defenses. The district court also prohibited Merit from raising the defense of bona fide purchaser for value without notice (BFP); the court apparently concluded that the BFP defense could not apply because IDEA, who had licensed Merit, "never had title" to begin with.

Having directed the jury to find infringement by Merit of the '781 patent, the district court submitted special interrogatories to the jury on the issue of damages based on a reasonable royalty and willfulness. The jury found that Merit had sold 600 infringing games, that a reasonable royalty was $100 per game, and that Merit's infringement was not willful. After adding pre-judgment interest, the Pennsylvania district court awarded Arachnid approximately $88,000. This appeal and cross-appeal followed.

## OPINION

Broadly phrased, the issue before us is whether the Pennsylvania district court erred in directing the verdict of infringement of the '781 patent (and in so doing, denying Merit's motion for a directed verdict). The pivotal question, of course, is Arachnid's standing, or lack thereof, to seek recovery for that infringement. Absent any written opinion but in light of the transcript of proceedings below, we construe the grant of the directed verdict for Arachnid as based upon a conclusion by the district court that Arachnid had standing to seek recovery of money damages based upon Merit's 1985–86 sales.

■ Our review of the district court's grant of the directed verdict for Arachnid is plenary. The district court was correct in directing the verdict only if, "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

**1578**

242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Relying on *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516 (1923) and similar authority, Merit's position is that Arachnid did not have "legal title"[2] to the '781 patent during 1985–86, when Merit sold the dual-microprocessor games, and absent such legal title had no standing to recover from anyone money damages for infringement occurring during that period. Prior to October, 1987 (when Kidde assigned the '781 patent to Arachnid per court order), Merit contends that Arachnid had at most only "equitable title"[3] to the '781 patent, and that such equitable title is insufficient to confer standing to sue for money damages for infringement under the federal patent laws.

Arachnid counters that, as the Wisconsin district court decreed, Arachnid "has always been" the owner of the invention of the '781 patent, and on that basis had standing to sue Merit for the infringement occurring in 1985–86. Arachnid contends that IDEA never had any interest in the '781 patent, "legal" or otherwise, because IDEA parted with any rights it might have obtained when it signed the consulting agreement with Arachnid in 1980. Because the consulting agreement was in effect self-executing, Arachnid also

contends that IDEA's interest in the '781 patent was void *ab initio*. Consequently, IDEA had nothing to convey to Merit, rendering IDEA's license to Merit a sham.

Alternatively, Arachnid argues, even if IDEA, not Arachnid, was the legal title holder of the '781 patent during the 1985–86 infringement, Arachnid still had standing to sue for damages as the equitable title holder during that time period, citing *Wooster v. Crane & Co.*, 147 Fed. 515 (8th Cir.1906) and *Southern Music Pub. Co. v. Walt Disney Prods.*, 73 F.Supp. 580, 74 USPQ 145 (S.D.N.Y.1947).

■ At the outset, we note that although the act of invention itself vests an inventor with a common law or "natural" right to make, use and sell his or her invention absent conflicting patent rights in others (and in certain circumstances, may similarly vest such rights in an employer of the inventor), a patent on that invention is something more. A patent in effect *enlarges* the natural right, adding to it the *right to exclude others* from making, using or selling the patented invention. *See Six Wheel Corp. v. Sterling Motor Truck Co.*, 50 F.2d 568, 571 (9th Cir.1931). A patent is a creature of statute,[4] as is the right of a patentee to have a remedy for infringement of his patent.[5] Suit must be brought on the *patent*, as ownership only of the invention gives no right to exclude, which

2. The entity to whom the grant of a patent is made by the PTO [or that entity's successor in title] holds the "legal title" to the patent. *See* G. Curtis, *A Treatise on the Law of Patents* § 168 (4th ed. 1873). The legal title holder may or may not be the inventor, according to whether provision has been made by the inventor for issuance to an assignee. *Id.* Thus defined, "legal title holder" is synonymous with "patentee" as defined by 35 U.S.C. § 100(d):

The word "patentee" includes not only the patentee to whom the patent was issued but also the successors in title to the patentee.

3. Equitable title may be defined as "the beneficial interest of one person whom equity regards as the real owner, although the legal title is vested in another." *Black's Law Dictionary* 1486 (6th ed. 1990).

4. 35 U.S.C. § 151, "Issue of patent," provides in part:

*If* it appears that *applicant is entitled to a patent under law,* a written notice of allowance of the application shall be given or

mailed to the applicant. The notice shall specify a sum, constituting the issue fee or a portion thereof, which shall be paid within three months thereafter.

Upon payment of this sum *the patent shall issue....*

(Emphases added).

35 U.S.C. § 261, "Ownership; assignment" provides:

Subject to the provisions of this title, patents shall have the attributes of *personal property.*

Applications for patent, patents, or any interest therein, shall be *assignable in law* by an instrument in writing.... (Emphases added).

5. 35 U.S.C. § 281, "Remedy for infringement of patent," provides:

A patentee shall have remedy by civil action for infringement of his patent.

is obtained only from the patent grant. In order to exercise that right, a plaintiff must necessarily have standing as comprehended by the patent statute.

■ With those thoughts in mind, we can not accept Arachnid's "Back-to-the-Future" theory. We hold that the Wisconsin district court's 1987 order decreeing Arachnid "to have been" the owner of the invention since its conception was legally ineffective to bestow standing upon Arachnid to retroactively seek patent infringement damages for the 1985–86 period. Although it may have validated Arachnid's right to seek *equitable* relief against IDEA (or its successors in liability), under these facts and the controlling authorities, the Wisconsin district court's order did not retroactively divest IDEA of legal title to the '781 patent during the 1985–86 timeframe and revest that legal title in Arachnid for standing purposes.[6]

■ The general rule is that one seeking to recover money damages for infringement of a United States patent (an action "at law") must have held the *legal title* to the patent *during the time of the infringement.* As stated by the Supreme Court in *Crown Die:*

> The law as to who should bring a suit at law for damages by infringement of a patent is clearly and correctly stated in

III Robinson on Patents, § 937 [1890], as follows:

> "With a single exception [7] the plaintiff in an action at law must be the person or persons in whom the *legal title* to the patent resided *at the time of the infringement.* An infringement is an invasion of the monopoly created by the patent, and the law which defines and authorizes this monopoly confers only upon its *legal owners* the right to institute proceedings for its violation. These owners are the patentee, his assignee, his grantee, or his personal representatives; and *none but these* are able to maintain an action for infringement in a court of law...."

261 U.S. at 40–41, 43 S.Ct. at 258–259 (emphasis added); *accord, Rel–Reeves, Inc. v. United States,* 606 F.2d 949, 959 n. 11, 210 USPQ 160 (Ct.Cl.1979). *See also Moore v. Marsh,* 74 U.S. (7 Wall.) 515, 522, 19 L.Ed. 37 (1868) ("the right of action is given to the person or persons owning the exclusive right at the time the infringement is committed"); 5 D. Chisum, *Patents* § 21.03[2][f] (1991) ("The issue in determining standing is whether the claimant possesses legal title ownership of the patent").

Arachnid in its responsive brief does not distinguish nor even address *Crown Die;* nor are we persuaded otherwise by Arachnid's citation to *Wooster* and *Southern*

---

6. Arachnid argues that this court's affirmance of the Wisconsin district court's 1987 order somehow binds us to find in its favor in this appeal. We disagree. The issue presented here, namely, Arachnid's right to recover for infringement occurring at a time prior to the 1987 order, was not before the Wisconsin district court, and thus was not considered by this court on the subsequent appeal from the order.

7. The exception referred to by Robinson is where the assignment of a patent is coupled with an assignment of a right of action for past infringements. The authorities are uniform that *the latter assignment must be express, and* can not be inferred from an assignment of the patent itself. *See, e.g., Moore v. Marsh,* 74 U.S. (7 Wall.) 515, 522, 19 L.Ed. 37 (1868) ("it is a great mistake to suppose that the assignment of a patent carries with it a transfer of the right to damages for an infringement committed before such assignment"); *Jones v. Berger,* 58 Fed. 1006 (D.Md.1893) ("The rule is that to pass the right to sue for past infringement words must be used

in the assignment which expressly transfer to the assignee the right of action"); 5 *Walker on Patents* (E. Lipscomb 3d ed. 1986) § 19:21 ("An assignment of a patent does not carry with it a transfer of the right to damages for an infringement committed before the assignment...."). The exception is not relevant here, for Arachnid conceded at oral argument (and the record supports) that none of the transfers of title involved in this case expressly bestowed any right of recovery for past infringement.

Although not applicable here, additional exceptions to the general rule have been recognized which confer standing upon non-patent owners to join infringement suits as co-plaintiffs with the patentee; *see, e.g., Kalman v. Berlyn Corp.,* 914 F.2d 1473, 16 USPQ2d 1093 (Fed. Cir.1990) (sole licensee with clearly defined nexus to patentee); *Weinar v. Rollform Inc.,* 744 F.2d 797, 223 USPQ 369 (Fed.Cir.1984) (exclusive vendor of patented product), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985).

*Music.* Importantly, in both of the latter cases the plaintiff sought an *equitable* remedy as opposed to damages *at law.* The court in *Southern Music* held that it had jurisdiction over the action of an equitable titleholder of a copyright *to enjoin* the legal owner and a third party from infringing the copyright, 73 F.Supp. at 583, 74 USPQ at 147; the court in *Wooster* affirmed the grant of a preliminary *injunction* restraining further infringement of a copyright equitably owned by the plaintiff by virtue of a written contract with the defendant author, 147 Fed. at 515–16.

Arachnid also relies on *Papazian v. American Steel & Wire Co. of New Jersey,* 155 F.Supp. 111, 115 USPQ 333 (N.D.Ohio 1957), in which the court indicates that once a plaintiff's claim of equitable ownership has been adjudged valid by a court having jurisdiction over *that* question, the same court could then proceed to consider a "claim for infringement" asserted by the adjudged equitable title holder. *Id.* at 118, 115 USPQ at 337. Arachnid misconstrues the import of the holding in *Papazian,* which was that where a plaintiff has been adjudged the equitable title holder of a patent, a federal district court has *jurisdiction* to consider claims for *equitable relief* stemming from the alleged infringement:

> An owner of the equitable title may seek redress against an infringer in a court of equity. If he has been fraudulently induced to part with his title, he may sue in equity for rescission of the transfer and if successful *may obtain full redress for infringement by way of injunction, accounting, declaration of trust, or other forms of equitable relief.* Where, upon the face of the pleadings, or the exhibits attached thereto, it is apparent that plaintiff's equitable interest arises under the patent laws, a District Court has jurisdiction in equity under Section 1338 of Title 28 U.S.C. to hear and determine a claim for infringement.

*Id.* at 117, 115 USPQ at 336 (emphasis added). In other words, a federal district court has jurisdiction to determine a "claim for infringement," asserted by an adjudged equitable title holder, as a prerequisite to awarding *equitable* relief for that infringe-ment. That equitable basis of district court jurisdiction was of no help to Papazian, however, nor does it assist Arachnid in this case. The district court denied Papazian's right to recover for infringement because Papazian (like Arachnid here) sought *money damages,* a remedy at law, not equity:

> But the foregoing authorities are of no aid to the plaintiff. He does not sue in equity. He seeks no rescission of the assignments of the patent. His action is one at law for damages. Diligent research by both counsel and the court *has failed to disclose a single case in the books in which an action at law for damages for infringement based upon an asserted equitable title has been maintained.*

*Id.* at 118, 115 USPQ at 337 (emphasis added).

Turning to the Arachnid/IDEA consulting agreement itself, we view as untenable Arachnid's position that when IDEA signed the agreement in 1980 it automatically divested itself of any and all rights to inventions that might be developed under the agreement or patents to issue thereon. Such a hindsight view ignores a key fact in this case, namely, that prior to the Wisconsin district court's order of April 27, 1987, a bona fide dispute existed as to whether IDEA had in fact conceived the invention of the '781 patent while under contract to Arachnid. That dispute was considered sufficiently genuine to be submitted to a jury, notwithstanding the jury finding in Arachnid's favor.

■ Even were we to disregard the litigation over ownership of the invention of the '781 patent, the fact remains that the Arachnid/IDEA consulting agreement was an *agreement to assign,* not an assignment. Its provision that all rights to inventions developed during the consulting period "will be assigned" by IDEA to Arachnid does not rise to the level of a present assignment of an existing invention, effective to transfer all legal and equitable rights therein to Arachnid and extinguish any rights of IDEA. Nor does the provi-

sion amount to a present assignment of an expectant interest. *See Filmtec Corp. v. Allied–Signal Inc.*, 939 F.2d 1568, 1572 (1991). Although an agreement to assign in the future inventions not yet developed may vest the promisee with *equitable* rights in those inventions once made, such an agreement does not by itself vest *legal* title to patents on the inventions in the promisee:

> The *legal* title to an invention can pass to another only by a conveyance which operates upon the thing invented after it has become capable of being made the subject of an application for a patent.

G. Curtis, *A Treatise on the Law of Patents* § 170 (4th ed. 1873) (emphasis added).

As support for its contrary assertion that, upon execution, the 1980 Arachnid/IDEA consulting agreement immediately divested IDEA of any legal or equitable title to the invention of the '781 patent, Arachnid cites *De Beaumont v. Williames*, 71 Fed. 812 (E.D.Pa.1896), *aff'd on other grounds*, 80 Fed. 995 (3d Cir. 1897). The case is plainly distinguishable from the situation here, for the district court in *De Beaumont* held that the plaintiff had no standing to sue for infringement of a patent that had previously been assigned to another. *De Beaumont* dealt with a recorded assignment of an existing patent, not an agreement to assign a future invention. Likewise, the court in *Wende v. Horine*, 191 Fed. 620 (N.D.Ill.1911), also cited by Arachnid, was dealing with an assignment, not an agreement to assign, when it held that having made such assignment, the plaintiff inventor lacked standing to seek issuance of the patent in his own name. Lastly, *Sims v. Mack Trucks, Inc.*, 407 F.Supp. 742, 191 USPQ 218 (E.D.Pa. 1976), also fails to support Arachnid's position. *Sims* involved an executed contract for sale of an issued patent, which contract included recitations that the seller "hereby sells" the patent which the buyer "hereby purchases." *Id.* at 744, 191 USPQ at 219. Plaintiff-sellers alleged, however, that the contract was merely an "agreement to assign" and did not effect an actual transfer of title because an additional contract provision recited that the seller "shall execute" a separate assignment of the patent within one month of execution of the contract of sale. The court disagreed, holding that the assignment provision was "a mere formality designed to guarantee payment and to facilitate recordation of the assigned patent [sic, assignment]." *Id.* Concluding its opinion with language that, ironically, strongly supports *Merit's* position, the *Sims* court stated that "since plaintiffs are not the legal titleholders who alone may maintain suit for patent infringement, we must dismiss the action." *Id.* at 744, 191 USPQ at 220.

■ Arachnid makes much of the fact that Merit continued to sell the dual-microprocessor games after March 5, 1986, when Merit was served with a copy of Arachnid's complaint against it. Arachnid contends that even if Merit can not be held liable for its sales prior to the date of actual notice of Arachnid's claim, Merit should be held liable for sales thereafter. We disagree. The fact that Merit had actual notice of Arachnid's *claim* at some point after which it continued to make sales does not change the facts that prior to April, 1987, a bona fide dispute existed as to who owned the invention, and that until Kidde assigned to Arachnid in October of that year, Arachnid was not the legal title holder of the '781 patent. The record indicates that upon receipt of Arachnid's complaint, Merit immediately verified with the PTO that IDEA was the owner of record of the '781 patent, and thereafter moved for dismissal of the '781 infringement count. At most, Merit took a calculated business risk to continue selling the dual-microprocessor games after March 5, 1986.

That Arachnid was wronged by IDEA's conduct was the verdict of the Wisconsin jury. The issue in this case, however, is whether Arachnid had standing to sue in 1989 for money damages for infringement that occurred in 1985–86, before Arachnid had obtained legal title to the '781 patent. For the reasons set forth *supra*, we hold that it did not.

**1582**

In light of our disposition on the issue of Arachnid's standing in favor of Merit, we need not reach Merit's alternative argument that even if Arachnid had standing to sue it, Merit cannot be liable for infringement because it obtained a valid license under the '781 patent from IDEA. Nor need we reach Merit's second alternative argument, that it should have been allowed to present its BFP defense to the jury. Lastly, since we have concluded that Arachnid does not have standing to recover money damages for infringement, we need not reach its cross-appeal concerning imposition of damages under the theory of lost profits.

## CONCLUSION

The Pennsylvania district court erred in directing a verdict of infringement in favor of Arachnid. Although the facts regarding standing were essentially undisputed, we hold that the district court incorrectly applied the governing law to those facts. Under a correct application of the law, the district court could not have reasonably concluded that only the verdict directed would be correct. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

Accordingly, the judgment of the district court is

REVERSED.