**HEIDELBERG HARRIS, INC.,
Plaintiff–Appellee,**

v.

**Michael H. LOEBACH, Defendant–
Appellant.**

No. 97–1553.

United States Court of Appeals,
Federal Circuit.

June 2, 1998.

Rehearing Denied June 26, 1998.

Karen Natalie Walker, Kirkland & Ellis, Washington, DC, argued, for plaintiff-appellee. With her on the brief were Andrew B. Clubok and John P. Frantz. Also on the brief were Thomas J. Donovan, McLane, Graf, Raulerson & Middleton, Manchester, NH; and Leslie Sullivan Stacey, Office of the General Counsel, Heidelberg Harris, Inc., Dover, NH.

Philip P. Mann, Ryan, Maki, Mann & Hohenfeldt, S.C., Milwaukee, WI, argued, for defendant-appellant.

Before CLEVENGER, BRYSON, and GAJARSA, Circuit Judges.

BRYSON, Circuit Judge.

Michael H. Loebach appeals from the July 22, 1997, judgment of the United States District Court for the District of New Hampshire granting summary judgment in favor of Heidelberg Harris, Inc. ("Harris"). The district court held that Loebach lacks standing to sue for patent infringement occurring prior to July 31, 1991, the date on which Loebach obtained legal title to the asserted patent. In a separate order, the district court held that Harris is a bona fide purchaser of a license under the asserted patent and therefore is not subject to suit for infringement of the patent. We conclude that the district court correctly resolved both issues, and we therefore affirm.

I

In the 1970s and early 1980s, Loebach was employed as an engineer for Motter Printing Company ("Motter"), a manufacturer of printing press equipment. While working at Motter, Loebach invented a "diverter" for a printing press, the details of which are not pertinent to this appeal. On December 12, 1980, Loebach assigned his rights in the invention to Motter. Thereafter, on February 15, 1983, U.S. Patent No. 4,373,713 (the '713 patent) was issued to Motter. The '713 patent claimed the diverter mechanism that Loebach invented.

On October 3, 1983, Motter entered into an agreement with Harris Graphics Corporation, a predecessor in interest to appellee Heidelberg Harris, Inc. Under the agreement, Motter was to design, manufacture, and test a machine incorporating the patented invention in exchange for funding provided by Harris. Although it retained ownership of the '713 patent and all the technical information concerning the invention, Motter licensed the invention to Harris under a licensing agreement that provided as follows:

In consideration of Harris' funding as outlined in Article 4 of this Agreement and Harris' technical assistance, for a period of seven (7) years, to the extent Motter is unable to supply the Harris requirement for the Product, Motter hereby grants to Harris an irrevocable, royalty-free, exclusive license to ... use the Patents to manufacture, use, and sell the Product in the Field of Use.... After seven (7) years, Motter hereby grants Harris an unrestricted, exclusive license [under the] ... Patents to manufacture, use, and sell the Product in the Field of Use. Provided that after the initial seven years, subject to Harris' business conditions, Harris will continue to solicit competitive bids from Motter for the manufacture of the Product.

The effective date of the agreement was October 3, 1983. The unrestricted license was therefore to take effect seven years later, on October 3, 1990.

Under the 1983 agreement, Harris was to pay Motter a total of $750,000 "for Motter's design efforts, licenses granted under this Agreement, and the prototype unit of the Product." The final payment was to be made when the prototype was installed and tested, one year after the agreement was signed. The 1983 agreement included a provision obligating the parties to enter into a manufacturing and purchase agreement under which Motter would supply all of Harris's requirements for the patented machines during the initial seven-year period, provided that Motter charged a "reasonable purchase price" for the devices.

Although Motter developed a working prototype and sold seven machines to Harris under the 1983 agreement, Motter was unable to produce the machines at a price acceptable to Harris. Apparently concerned that Harris would invoke the conditional royalty-free license provision if Motter could not produce the machines cheaply enough, Motter negotiated a second agreement with Harris, which took effect on February 15, 1985.

Under the 1985 agreement, Motter agreed to sell Harris the "manufacturing rights" to the patented device for a "royalty payment" of $65,000 per device. Motter agreed to provide drawings, technical assistance, and other expertise to Harris. The 1985 agreement was to run until October 3, 1990 (i.e., until the end of the original seven-year period). It left undisturbed Harris's rights under the 1983 agreement to an unrestricted license to the patent after October 3, 1990. During the five years that the 1985 agree-

ment was in effect, Harris paid Motter a total of $4.3 million for the right to produce 61 of the patented machines.

## II

In August 1989, Loebach discovered that Harris was paying Motter a royalty for the right to manufacture machines incorporating the patented invention. Loebach allegedly contacted Harris in November 1989 and informed it that he claimed ownership of the '713 patent. In April 1990, Loebach sued Motter in the United States District Court for the Middle District of Pennsylvania. In his complaint, Loebach alleged that his assignment to Motter was void due to fraud and failure of consideration, and he sought to impose a constructive trust on all royalties and profits that Motter received from Harris. Harris was not a party to the Pennsylvania litigation.

Following a jury verdict in Loebach's favor in July 1991, the Pennsylvania district court rescinded the assignment to Motter and awarded Loebach the entire $4.3 million that Motter had collected from Harris. The rescission, effective on July 31, 1991, vested legal title to the patent in Loebach as of that date. On Motter's motion for reconsideration, the court reduced the damage award to $831,125 by applying a reasonable royalty rate of 25% to the $4.3 million that Motter had received from Harris. Loebach appealed to the United States Court of Appeals for the Third Circuit, which affirmed the district court's judgment.

Loebach allegedly began contacting Harris's customers in October 1992 and accusing them of infringing the '713 patent. In response, Harris sued Loebach in the United States District Court for the District of New Hampshire, seeking an injunction, declaratory relief, and money damages based on Loebach's threats relating to the '713 patent. Loebach counterclaimed for patent infringement, Lanham Act violations, and conversion of the patented invention.

Harris filed a motion to dismiss Loebach's counterclaims on the basis of collateral estoppel and res judicata stemming from the Pennsylvania litigation between Loebach and Motter. The district court treated Harris's motion as one for summary judgment and granted it in part. Although the court rejected Harris's collateral estoppel and res judicata arguments, the court concluded that Loebach lacked standing to sue for patent infringement and conversion occurring before July 31, 1991, because he did not obtain legal title to the '713 patent until that date. The court left open the possibility that Loebach could assert claims against Harris for acts occurring after that date. In a footnote, however, the court suggested that Harris might qualify as a bona fide purchaser of a license under the patent and thus have a defense to Loebach's post–1991 claims.

Harris filed a second motion for summary judgment in which it raised the bona fide purchaser defense. The district court granted Harris's motion based on this court's decision in *Filmtec Corp. v. Allied–Signal, Inc.*, 939 F.2d 1568, 19 USPQ2d 1508 (Fed.Cir. 1991). The district court concluded that Harris did not learn of Loebach's claim to the patent until November 1989, and that Harris's unrestricted license vested in 1983, when the original licensing agreement was signed. Consequently, the court concluded that Harris held a valid license under the patent and that the license gave Harris full and permanent protection against liability for infringing the '713 patent.

## III

Loebach contends that the district court committed three errors requiring reversal. We have reviewed each claim of error carefully and conclude that none requires us to disturb the district court's judgment.

### A

■ Loebach first argues that the district court erred in holding that he lacks standing to sue for any acts of infringement occurring before July 31, 1991, the date on which the Pennsylvania district court rescinded the previous assignment to Motter. Because the Pennsylvania district court ordered the Motter assignment rescinded, Loebach argues that the assignment was void *ab initio*. According to Loebach, the rescission was retroactive and had the effect of placing the par-

ties in the same positions they would have occupied if the assignment had never been made.

We agree with the district court that the resolution of this issue is controlled by our decision in *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574, 19 USPQ2d 1513 (Fed.Cir.1991). In that case, we held that a plaintiff cannot sue for patent infringement occurring prior to the time the plaintiff actually obtained legal title to the asserted patent. Loebach's argument that a court can retroactively vest legal title in the plaintiff for purposes of standing was specifically considered and rejected in that case. *See id.* at 1579, 939 F.2d 1574, 19 USPQ2d at 1517 ("We hold that the Wisconsin district court's 1987 order decreeing Arachnid 'to have been' the owner of the invention since its conception was legally ineffective to bestow standing upon Arachnid to retroactively seek patent infringement damages for the 1985–86 period.").

Loebach attempts to distinguish *Arachnid* by arguing that the district court in that case did not actually rescind the original assignment, but merely ordered the patent to be assigned to Arachnid. We do not agree with Loebach's characterization of that case. The district court in *Arachnid* declared Arachnid "to have been" the owner of the invention from the outset, yet this court nonetheless rejected Arachnid's argument that it was entitled to sue for infringement during the period before it obtained record title to the patent. *Id.* at 1579, 939 F.2d 1574, 19 USPQ2d at 1517; *see also Curtis Mfg. Co. v. Plasti–Clip Corp.*, 933 F.Supp. 94, 101–02 (D.N.H.1995).

Loebach further contends that *Arachnid* expressly recognizes rescission as a remedy and acknowledges the right of an aggrieved party to obtain full redress for pre-title infringement by way of injunction, accounting, declaration of trust, or other forms of equitable relief. That aspect of *Arachnid*, however, is not inconsistent with the district court's decision in this case. Loebach has already been awarded equitable relief in the amount of $831,125 for infringement stemming from the Harris agreements, and he has regained legal title to his patent. Nothing in *Arachnid* suggests that Loebach is entitled to further relief by also obtaining legal damages for Harris's pre–1991 activities. Consequently, we find no error in the district court's conclusion that Loebach lacks standing to sue Harris for activities occurring prior to July 31, 1991.

B

■ Relying in part on this court's decision in *Filmtec Corp. v. Allied–Signal, Inc.*, 939 F.2d 1568, 19 USPQ2d 1508 (Fed.Cir. 1991), the district court concluded that Harris was a bona fide purchaser for value of a license under the 1983 agreement and was therefore not liable for infringement of the '713 patent. As this court noted in *Filmtec*, the bona fide purchaser for value rule, as applied to patents, provides that one who acquires an interest in a patent for valuable consideration from the legal title holder, "without notice of an outstanding equitable claim or title," is entitled to retain the purchased interest, "free of any equitable encumbrance." *Id.* at 1573, 939 F.2d 1568, 19 USPQ2d at 1512.

■ Although Loebach does not dispute the availability of the bona fide purchaser defense generally, he contends that the district court erred in holding that Harris is a bona fide purchaser in this case. According to Loebach, Harris had notice of Loebach's claim prior to October 3, 1990, the date on which Harris received the royalty-free license under the 1983 agreement, and Harris therefore cannot rely on the bona fide purchase rule to avoid infringement liability.

Loebach's principal contention is that the proper "notice" date is October 3, 1990, which Loebach characterizes as "the date on which Harris would complete its own performance under the 1983 agreement and the transfer of the 'unrestricted license' would take place." Thus, Loebach contends that Harris's unrestricted license under the patent vested no earlier than October 3, 1990.

■ The construction of a license agreement is a question of law that this court reviews *de novo*. *See Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381, 1384, 37 USPQ2d 1884, 1887 (Fed.Cir.1996). The 1983 agreement

creates two distinct licensing periods—a conditional license for a seven-year period if Motter is unable to supply Harris's requirements, and a subsequent unrestricted license. The agreement uses the present tense ("hereby grants") to refer to the grant of both licenses, which creates the inference that both licenses vested immediately, although the unrestricted license was not immediately operative. The unrestricted license is not contingent upon any future event other than the passage of time, a limitation that does not prevent the vesting of the license. *See* Restatement (Second) of Contracts § 224 cmt. b (1981) ("the mere passage of time, as to which there is no uncertainty, is not a condition"); *see also Doe, Lessee of Poor v. Considine,* 6 Wall. 458, 73 U.S. 458, 475, 18 L.Ed. 869 (1867) ("Adverbs of time— as where, there, after, from, & c.—in a devise of a remainder, are construed to relate merely to the time of the enjoyment of the estate, and not the time of the vesting in interest."); *B–B Co. v. Piper Jaffray & Hopwood, Inc.,* 931 F.2d 675, 678 (10th Cir.1991) ("A condition precedent is defined as an act or event, *other than a lapse of time,* which must exist or occur before a duty of immediate performance of a promise arises."(emphasis added)).

We find nothing in the 1983 agreement that would divest Harris of its unrestricted license. Harris's only obligations under the 1983 agreement were (1) to pay Motter $750,000 in consideration for the design and the licenses; (2) to solicit competitive bids from Motter after the seven-year period, subject to Harris's business conditions; and (3) to negotiate and enter into a manufacturing and purchase agreement with Motter.

Loebach does not dispute that Harris paid Motter the $750,000 and entered into a manufacturing and purchase agreement long before Loebach's alleged 1989 notification to Harris. Loebach contends, however, that Harris would not "complete its own performance under the 1983 Agreement" until October 3, 1990. As evidence of Harris's continuing performance under the 1983 agreement, Loebach asserts that after receiving notice of Loebach's claim to the '713 patent in November 1989, Harris continued to "pay Motter over $840,000" and "elected to sit on the sidelines and await the results of [the Pennsylvania] litigation." Loebach also asserts that it was unclear whether the parties would perform "various other obligations affecting whether Harris would, in fact, ever receive or keep the 'unrestricted exclusive license.'" One such obligation, according to Loebach, was that "Harris would need to continue paying royalties of at least $65,000 per machine until October 3, 1990." Additionally, Loebach points to the provision that required Harris to solicit bids from Motter after the seven-year period.

None of the obligations to which Loebach refers prevented the vesting of the unrestricted license. The continuing payments made by Harris were made pursuant to the 1985 agreement, which required "royalty payments" of $65,000 per machine. Nothing in the 1983 agreement, other than payment of the initial $750,000 consideration, obligated Harris to make any further payments to Motter for the licenses.

■ As a general proposition, in order to defeat a bona fide purchaser defense on the basis of notice, the purchaser must receive the notice before he has paid the consideration or before he has performed his purchase obligations. *See* 77 Am.Jur.2d, *Vendor and Purchaser* § 497 (1997). Given that Harris paid its consideration and met its purchase obligations under the 1983 agreement long before Harris first received notice of Loebach's claim on the patent, we conclude that the district court properly ruled in Harris's favor on this issue. *See La Fon v. Grimes,* 86 F.2d 809, 812–13 (5th Cir.1936) (bona fide purchaser defense available unless "payment remains executory between purchaser and seller"); *Mossler Acceptance Co. v. Johnson,* 109 F.Supp. 157, 168 (W.D.Ark. 1952) ("The crucial date to be considered in determining whether or not one is a bona fide purchaser, from the standpoint of notice, is that upon which he actually parts with consideration for the property or his interest therein."); *The Hercules,* 12 F. Cas. 8, 11 (E.D.Mich.1875) ("mere notice [cannot] affect the rights of a bona fide purchaser, unless

such notice be had at the time of purchase, or of payment").

Although Harris was required to solicit bids *after* the seven-year period, that obligation did not prevent the vesting of the unrestricted license. *See, e.g., Collins v. Marina–Martinez,* 894 F.2d 474, 479 (1st Cir. 1990) (rights subject to fulfillment of a condition subsequent are nevertheless vested property interests); *Mora v. Mora,* 429 S.W.2d 660, 662 (Tex.Civ.App.1968, writ dism'd w.o.j.) (same). Under Loebach's reading of that obligation, the unrestricted license could never vest until it had been determined, at the end of the license period, that Harris had complied throughout the entire period.

Loebach next argues that the Pennsylvania district court in 1992 held that Harris's rights in the unrestricted license did not vest until 1990 and that the ruling of the New Hampshire district court in this case directly contradicts that earlier decision. We disagree. In our view, there is nothing in the district court's decision in this case that is inconsistent with the decision of the Pennsylvania district court. The Pennsylvania court's memorandum decision merely acknowledged that "[a]fter seven years, Harris would be granted an exclusive license to manufacture, use and sell the technical information and patents involved in the PFF folder." That characterization of the 1983 agreement was simply a paraphrased version of the language in the license. The Pennsylvania court made no specific finding regarding whether the unrestricted license vested prior to Loebach's alleged notice to Harris. Consequently, the Pennsylvania decision provides no basis for reversal.

Loebach further argues that Harris voluntarily made payments to Motter after November 1989, when it should have known about Loebach's claim, and that those payments were necessary to secure Harris's rights to an unrestricted license beginning in 1990. This argument is without merit. Harris obtained its license in the '713 patent under the 1983 agreement and, as we have held, its right to that license had already vested by 1989. The payments that Harris made for individual machines during the period between 1985 and 1990 were made under the 1985 agreement, not the 1983 agreement, and thus had no effect on Harris's already-vested license.

█ Finally, Loebach argues that Harris should have joined the Pennsylvania action or filed a claim against Motter for failure of consideration once Harris became aware of Loebach's claim to the '713 patent, and that having failed to take those steps, it should not be entitled to rely on the bona fide purchaser rule to avoid Loebach's infringement claims. Loebach has not directed our attention to any legal authority suggesting that a bona fide purchaser for value forfeits his right to rely on that rule unless he takes legal action against the party from whom he made his purchase, and we decline Loebach's invitation to adopt any such proposition in this case.

### C

█ Loebach contends that the district court erred in not holding that Harris was collaterally estopped from raising the bona fide purchaser defense. According to Loebach, because the Pennsylvania district court held that "all rights and title to the patent now vest in Loebach," Harris may not assert that it enjoys a license to use the patented invention.

We agree with the district court that the issues litigated in the Pennsylvania action did not include a determination of the rights that Harris acquired under the 1983 agreement. Although Loebach contends that the Pennsylvania action "effectively voided all [license] transfers," the Pennsylvania district court's order does not support that contention.

Loebach asserts that because the Pennsylvania court found that "[a]fter seven years, Harris would be granted an exclusive license to manufacture, use and sell the technical information and patents," Harris's rights under the license were necessarily adjudicated. We do not agree. As discussed previously, we have concluded that the unrestricted license vested in Harris no later than the time that Harris met its purchase obligations under the 1983 agreement, even though Harris did not have the right to begin using that

license until seven years later. The Pennsylvania district court order made no mention of the bona fide purchaser defense and said nothing about when Harris's interest in the license vested.

Loebach's collateral estoppel theory rests on the assumption that the Pennsylvania district court's order retroactively divested any prior purchaser of its interest in the '713 patent, an assumption that we have previously rejected. Consequently, we agree with the district court's conclusion that Harris is not estopped from establishing that it enjoys an unrestricted license under the patent.

*AFFIRMED.*