**SKW AMERICAS, et al., Plaintiffs,**

v.

**EUCLID CHEMICAL COMPANY,
Defendant.**

No. 1:01CV0455.

United States District Court,
N.D. Ohio,
Eastern Division.

May 17, 2002.

Andrew N. Parfomak, Fish & Richardson, New York, NY, Douglas V. Bartman, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, OH, George E. Heibel, John B. Pegram, Fish & Richardson, New York, NY, Michael H. Diamant, Shira Adler, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, OH, for SKW Americas, Inc., MBT Holding AG.

Christopher B. Fagan, Fay Sharpe Fagan Minnich & McKee, Cleveland, OH, for Euclid Chemical Co., Inc.

## MEMORANDUM & ORDER

O'MALLEY, District Judge.

Plaintiffs SKW Americas, Inc. and MBT Holding AG (collectively, "MBT") bring this patent infringement action against defendant Euclid Chemical Company. Euclid moves the Court to dismiss the action for lack of subject matter jurisdiction, based on lack of legal title to the patent at issue (docket no. 44). For the reasons stated below, this motion is **DENIED.**

■ Euclid notes correctly that, to proceed with a patent infringement claim,

the plaintiff must own valid legal title. *Arachnid, Inc. v. Merit Inds., Inc.,* 939 F.2d 1574, 1578–79 (Fed.Cir.1991). If the plaintiff does not own valid legal title to the patent, it does not have standing to bring the lawsuit, and the Court is without subject matter jurisdiction over the case. *See Gaia Technologies v. Reconversion Tech.,* 93 F.3d 774, 777 (Fed.Cir.1996) ("[t]he question of a party's standing to bring a case is a jurisdictional one"). Legal title may be obtained by the plaintiff through assignment, but the assignment "must be in writing," *id.* (citing 35 U.S.C. § 261), and must "[take] place before the lawsuit was filed," *id.* at 780.

█ Early in this case, Euclid asked MBT for proof that, at the time it filed suit on February 16, 2001, it held valid legal title to the patent at issue, being reissue patent RE–35194. MBT first responded by producing a document executed by Novartis on December 2, 1996, purportedly assigning the patent to MBT. Euclid pointed out that this document could not show MBT had valid legal title to the patent because Novartis was not formally founded until December 20, 1996, 18 days after the purported assignment. MBT then produced a "corrected assignment," signed by Novartis on September 12, 2001, purportedly having an effective date of December 20, 1996. Euclid pointed out that this document also could not show MBT had valid legal title because this corrected assignment did not exist before the lawsuit was filed. *Gaia,* 93 F.3d at 779–80. MBT tried again by producing an apparently old, but undated, document which stated that Sandoz (which was Novartis's predecessor): (1) had "transferred to [MBT] all

intellectual property rights" on December 2, 1996; and (2) now assigned to MBT its rights under a License Agreement, effective as of December 2, 1996. Euclid pointed out that this document was undated and, therefore, still did not show MBT had valid legal title *before* it had filed its complaint.[1]

Finally, one full year after it filed this lawsuit, MBT produced an "Agreement between [Sandoz and MBT] regarding the Sale and Purchase of certain intellectual property and related rights." This Agreement, which is dated December 2, 1996, contains the following language:

> As of this day SANDOZ sells, transfers and assigns to MBT for its free and unrestricted use all of the following, to the extent owned by or licensed to it, and to the extent related to or used in MBT:
>
> 1.1 *Patents, Marks and Designs.* Patent rights, registered and unregistered trade mark and service mark rights, trade names, labels, logos, registered and unregistered design rights, utility models, and in particular all registered and pending patents, trade and service marks and utility models listed as property of SANDOZ (and/or other Sandoz Group entities other than the companies in the MBT Division) in *Annex I* hereto for the full period and all extensions and renewals thereof, and the right to apply for any of the foregoing in any part of the world.

Agreement at 1–2. Euclid again objected that this evidence of ownership was deficient, because the RE–35194 patent was

---

**1.** Given that Sandoz ceased to exist in December of 1996, this third document arguably *did* show transfer of title *before* MBT filed its complaint. The document has other problems, however, including that it principally refers to licensing rights and not title to any

patent, makes no reference to the patent at issue, and apparently refers to *another* document that did address the transfer of patent rights. As noted below, MBT finally produced this other document.

not listed in "Annex I." Indeed, Euclid further objected (persuasively) that the documents identified by MBT as "Annex I" are not, in fact, the actual Annex I at all.

The Court concludes, however, that Annex I merely listed a subset of the "patents, marks and designs" transferred by Sandoz to MBT; Annex I was not meant to be a complete listing of such property. The Agreement states that Sandoz sells "all of the following" to MBT and then lists virtually every type of intellectual property that exists.[2] Under the heading of "Patents, Marks, and Designs," the Agreement states in pertinent part that Sandoz sells its "[p]atent rights ..., and in particular all registered and pending patents ... listed as property of SANDOZ ... in *Annex I*." Euclid essentially asserts that the language "and in particular" should be construed to mean "specifically limited to." In the context of the entire Agreement, however, a more accurate construction of the phrase "and in particular" is "including, in particular."[3] In other words, the Agreement transfers *all* of Sandoz's patents to MBT, and lists in Annex I certain, "particular" patents that are included in this transfer. Annex I is not meant to be an exclusive list.

Given this construction of the Agreement, MBT has met its burden of showing standing. The Agreement transfers to MBT, in writing, valid legal title in *all* of Sandoz's patents. Euclid does not argue that Sandoz did not own legal title to patent RE–35194 on December 2, 1996, when the Agreement was executed. Thus, the written transfer occurred before MBT filed suit.

The Court notes here that its decision is a close one. There is certainly a nonfrivolous argument that the "in particular" language of the Agreement meant that Annex I listed *all* of the intellectual property that Sandoz meant to transfer, and that MBT has not shown Annex I included patent RE–35194. Furthermore, there is no question but that MBT's earlier efforts to prove it obtained timely transfer of valid legal title were wanting. That MBT failed to show standing the first three times it tried, however, cannot taint the Court's examination of its fourth effort. The motion to dismiss must be denied. The Court will turn to the issue of claims construction in a separate opinion, as soon as it can.

**IT IS SO ORDERED.**

---

**2.** The Agreement lists: (1) "patents, marks and designs;" (2) "reputation and goodwill;" (3) "technical know how;" (4) "commercial know how;" and (5) "copyrights and copyright works."

**3.** Indeed, as Euclid notes, the context in which the Agreement was executed includes the fact that the Federal Trade Commission had required Sandoz to completely divest itself of its construction chemical business.