*354
 
 OPINION OF THE COURT
 

 Read, J.
 

 This case involves a dispute under a stock purchase agreement whereby Westmoreland Coal Company acquired all of the outstanding capital stock of several of Entech’s coal mining subsidiaries (the Companies). Entech appeals from an order of the Appellate Division, which affirmed Supreme Court’s determination that all of Westmoreland’s objections to asset values in Entech’s closing date certificate were subject to alternative dispute resolution (ADR) under the stock purchase agreement’s purchase price adjustment provisions. For the reasons that follow, we conclude that Westmoreland’s objections directed at an asset value’s accounting treatment allege breaches of representation or warranty for which the exclusive remedy was an action at law, as specified in the stock purchase agreement’s indemnification provisions.
 

 I.
 

 On September 15, 2000, Entech and Westmoreland executed a stock purchase agreement (the Agreement), which included the Companies’ unaudited balance sheets and related unaudited statements of operations for various fiscal years, as well as the most recent unaudited balance sheets prepared as of July 31, 2000. Entech represented and warranted that, with limited exceptions not relevant here, all these interim financial statements “were prepared in accordance with GAAP [generally accepted accounting principles] and fairly presented] in all material respects the consolidated financial condition and statement of operations of the Companies * * * as of the respective dates thereof and for the respective periods covered thereby” (Agreement § 2.08 [a]).
 

 
 *355
 
 Based on the interim financial statements, the stock purchase agreement pegged the Companies’ net asset value at $97,120,000 as of July 31, 2000; and the parties agreed to a purchase price of $138 million, subject to adjustment to account for two contingencies specified in the purchase price adjustment provisions (§ 1.04). First, they agreed to adjust the purchase price to reflect a net asset value on the closing date higher or lower than the baseline of $97,120,000. Second, if the closing took place after December 31, 2000, Entech was required to pay Westmoreland the Companies’ net revenue from January 1, 2001 up to and including the closing date.
 

 The transaction closed on April 30, 2001. Within 60 days thereafter, Entech provided Westmoreland with the closing date certificate (essentially, a balance sheet and income statement for the Companies as of the closing date) called for by the purchase price adjustment provisions. The closing date certificate, prepared on an accounting basis “consistent with” the interim financial statements, set forth Entech’s calculation of the aggregate value of the Companies’ net assets as of the closing date (§ 1.04 [a]). Since the closing occurred after December 31, 2000, the certificate also included the Companies’ net revenue from January 1 through April 30 of 2001.
 

 The closing date certificate reflected a net asset value of approximately $107.3 million as of April 30, 2001, and net revenue for the first third of 2001 of about $6.3 million. Netting the latter figure against the $10.2 million change in the net asset value produced an adjustment in Entech’s favor of approximately $3.9 million, or 2.8% of the purchase price. This number plus $5 million of the $138 million purchase price, which Entech had agreed to defer past the closing date, totalled roughly $9 million.
 

 For its part, Westmoreland objected to the closing date certificate, claiming an adjustment in its favor of about $74 million
 
 [1]
 
 — more than half the purchase price and more than two thirds of the baseline net asset value reflected on the interim financial statements — because many of the asset values in the closing date certificate allegedly did not comply with GAAP. Westmoreland lodged its objections in accordance with the
 
 *356
 
 procedures specified in the Agreement's purchase price adjustment provisions.
 
 [2]
 

 These procedures, under section 1.04 (b) of the Agreement, afforded Westmoreland 30 days following receipt of the closing date certificate in which to make “an objection to a material aspect” of it. If the parties reached agreement as to “those aspects as to which the objection was made” within 15 days, the closing date certificate was amended accordingly. If they failed to reach agreement within 15 days, “their disagreements [were] promptly submitted to a nationally recognized independent accountant.” The independent accountant was required to “conduct such additional review as [was] necessary to resolve the specific disagreements referred to it,” and to determine the final closing date certificate within 30 days of the referral. The closing date certificate determined by the independent accountant was final and binding on the parties.
 

 Entech declined to submit to ADR under the Agreement’s purchase price adjustment provisions. In Entech’s view, insofar as Westmoreland objected to asset values carried over from the interim financial statements to the closing date certificate for failure to comply with GAAP, consistently applied, its exclusive remedy was a lawsuit for breach of a representation or warranty in a court of competent jurisdiction, as provided for by the Agreement’s indemnification provisions (art X).
 

 Under these provisions, Entech was required to indemnify Westmoreland
 

 “in respect of, and hold it harmless from and against, any and all Adverse Consequences[
 
 3
 
 ] suffered, incurred or sustained by it or to which it becomes subject,
 
 resulting from, arising out of or relating to any breach of representation or warranty * * * on the part of Seller contained in this Agreement”
 
 (§ 10.01 [a] [emphasis added]).
 

 
 *357
 
 This indemnification was, moreover, subject to certain monetary limitations, including a $1.75 million threshold; i.e., indemnification, except as related to environmental matters, was available only for amounts in excess of $1.75 million in the aggregate (§ 10.01 [c] [i] [B]).
 

 Disputes over representations and warranties, if not amicably reconciled, were to “be resolved by litigation in a court of competent jurisdiction” (§ 10.02 [b]). Moreover, after the closing, the remedies set forth in the indemnification provisions were the parties’ “exclusive remedies” for misrepresentation or breach of any warranty contained in the Agreement; and the parties were not entitled to rescission or “any further indemnification rights or claims of any nature whatsoever in respect [of the Agreement], all of which the parties * * * waive” (§ 10.03).
 

 Westmoreland subsequently commenced this proceeding under CPLR 7601, seeking to compel Entech to submit the parties’ dispute to an independent accountant for resolution. According to the petition, Westmoreland “currently believes” that Entech owes it a purchase price adjustment of roughly $30.3 million.
 
 [4]
 
 Westmoreland asserts that
 

 “many of the items in dispute result from the fact that Entech’s Closing Date Certificate and related schedules were not prepared in accordance with GAAP, as they were required to be, which resulted in a Net Asset Value calculation and Net Revenue Amount that are illegitimate and erroneous. Accordingly, the entire amounts in dispute are subject to resolution by the Independent Accountant.”
 

 Supreme Court granted Westmoreland’s petition and ordered the parties to select a mutually acceptable independent accountant in conformity with the Agreement’s purchase price adjustment provisions. The Appellate Division affirmed, determining that the purchase price adjustment provisions unambiguously required any “material” objection to the closing date certificate to be submitted to arbitration by the independent accountant, who was “to decide whether any individual objection [was] sufficiently ‘material’ to warrant an adjustment” (296 AD2d 317, 317 [1st Dept 2002]).
 

 
 *358
 
 II.
 

 “A
 
 written contract ‘will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.’ * * * The meaning of a writing may be distorted where undue force is given to single words or phrases”
 
 (.Empire Props. Corp. v Manufacturers Trust Co.,
 
 288 NY 242, 248 [1942], quoting 3 Williston, Contracts § 618). Reading the Agreement as a harmonious and integrated whole, we conclude that Westmoreland’s objections related to accounting conventions, estimates, assumptions or asset values common to both the interim financial statements and the closing date certificate unambiguously fall within the Agreement’s indemnification provisions, not its purchase price adjustment provisions.
 

 The purchase price adjustment provisions require Entech to prepare the closing date certificate “on a basis
 
 consistent
 
 with the preparation of the Interim Financial Statements” (§ 1.04 [a] [emphasis added]). The “Guiding Principles for Calculation of Net Asset Value and Net Revenue Amount,” dated April 25, 2001, which provided general and specific instructions for preparation of the closing date certificate, similarly stress consistency, providing that
 

 “[t]hese principles are based upon generally accepted accounting principles (GAAP),
 
 applied consistently,
 
 and will be used as the primary guide for calculating the Net Asset Value and the Net Revenue Amount at the Closing Date based upon the consolidating balance sheets and consolidating income statements of [the Companies]. * * * The accounting will be in accordance with GAAP
 
 applied on a consistent basis with past practices
 
 used by [the Companies] to determine appropriate accruals. The accounting principles shall be
 
 consistent with the principles used
 
 to prepare the financial statements disclosed in Section 2.08 (a) of the stock purchase agreement [which included the interim financial statements]” (emphasis added).
 

 In many instances, GAAP may provide more than one potentially applicable accounting methodology, and so the accounting professional may legitimately record a transaction in acceptable alternative ways. What is most important is that, when preparing financial statements intended to be used for comparative purposes, the methodology be consistently ap
 
 *359
 
 plied; i.e., the accountants follow the same permissible accounting conventions and use in each instance the same GAAP assumptions and estimates when computing the reported values. This emphasis on consistent treatment can only reflect a purpose to flag changes in value occurring as a result of the Companies’ operations between July 31, 2000 (the date of acquisition pricing) and the closing date.
 

 Further, Entech specifically represented and warranted that the interim financial statements complied with GAAP. The Agreement’s indemnification provisions afford a complete, comprehensive remedy for any and all claims for breach of a representation or warranty. The indemnification provisions further set out a detailed method for asserting claims for breach of a representation or warranty and require that, if negotiations fail, these claims are to be resolved
 
 exclusively
 
 by litigation. Westmoreland waives all other indemnification rights and claims. Thus, Westmoreland’s interpretation of the purchase price adjustment provisions to provide a remedy for breach of a representation or warranty — which is exactly what Westmoreland asserts when it objects to an asset value on the closing date certificate for failure to comply with GAAP, consistently applied — would subvert this “exclusive remedies” limitation and waiver, and would allow Westmoreland to circumvent the $1.75 million threshold.
 

 Westmoreland’s interpretation of the purchase price adjustment provisions would also undermine the Agreement’s due diligence provisions. Westmoreland represented and warranted to Entech that it was “experienced and knowledgeable in the coal business, and [was] aware of its risks” (Agreement § 3.07). This experience presumably encompassed familiarity with accounting conventions or problems, including any peculiar to the coal industry. Moreover, Westmoreland’s representatives were afforded the opportunity to visit both the Companies’ offices and active operations and to examine the books and records prior to embarking on the transaction.
 

 Such due diligence review is undertaken, among other reasons, so that the purchaser may perform an independent investigation of the target company and make an independent judgment as to the economics and risks prior to committing to a transaction or agreeing on a purchase price. In addition, this particular transaction was apparently the result of an auction or competitive bidding process. Now, Westmoreland has interposed objections that, if fully credited by an independent accountant in a streamlined ADR proceeding, would reduce the
 
 *360
 
 purchase price by roughly 22% on the basis of objections to the transaction’s underlying accounting fundamentals. As a matter of due diligence, Westmoreland knew about (or certainly had the opportunity to learn) the accounting methodologies employed by Entech before agreeing to acquire the Companies. These sophisticated commercial parties surely could not have intended to consign a significant portion of the purchase price to ADR, and, in fact, they did not: Westmoreland’s objections related to noncompliance with GAAP are, in fact, claims for breach of a representation or warranty. These claims may only be pursued in a court of law, with its attendant protections of discovery, rules of evidence, burden of proof, and full appellate review.
 

 Westmoreland contends that Entech seeks to rewrite the purchase price adjustment provisions to insert specific words limiting these provisions to changes in value occurring between the acquisition and closing dates. But the words of these provisions, when read in the context of the entire Agreement rather than in isolation, are plain enough.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted to Supreme Court for evaluation of Westmoreland’s individual objections in conformity with this opinion.
 

 Chief Judge Kaye and Judges Smith, Ciparick, Rosenblatt and Graffeo concur.
 

 Order reversed, with costs, and matter remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein.
 

 [1]
 

 . Westmoreland reduced this figure by nearly $9 million (i.e., Entech’s $3.9 million claimed adjustments plus the $5 million pm-chase price credit), and so actually initially sought a refund of approximately $65 million from Entech.
 

 [2]
 

 . Westmoreland subsequently also made the same objections in written indemnity notices, which were timely delivered to Entech in conformity with the Agreement’s indemnification provisions.
 

 [3]
 

 . The stock purchase agreement defined “Adverse Consequences” as “all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, deficiencies, costs, liabilities, obligations, taxes, liens, losses, expenses, and fees, including, without limitation, court costs, interest and reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other proceedings or of any claim, default or assessment” (Agreement § 12.01 [a]).
 

 [4]
 

 . Again, this appears to be a net figure; i.e., Westmoreland computed purchase price adjustments totalling about $39 million, reduced to $30 million after subtracting the $9 million claimed by or owing to Entech.