# United States Court of Appeals for the Federal Circuit

2009-1208, -1209

IMATION CORP.,

Plaintiff-Appellant,

v.

KONINKLIJKE PHILIPS ELECTRONICS N.V., U.S. PHILIPS CORPORATION,
and PHILIPS ELECTRONICS NORTH AMERICA CORPORATION,

Defendants/Third-Party Plaintiffs-
Appellees,

v.

MOSER BAER INDIA LIMITED,

Third-Party Defendant-Appellant,

and

GLOBAL DATA MEDIA FZ-LLC, MBI INTERNATIONAL FZ-LLC,
MBI INTERNATIONAL SERVICES PRIVATE LIMITED,
MBI INDIA MARKETING PRIVATE LIMITED, GLYPHICS MEDIA, INC.,
and MEMOREX INTERNATIONAL, INC.,

Third-Party Defendants.

Ronald J. Schutz, Robins, Kaplan, Miller & Ciresi L.L.P., of Minneapolis, Minnesota, argued for plaintiff-appellant. Of counsel were Scott M. Flaherty and David P. Swenson.

Marc De Leeuw, Sullivan & Cromwell LLP, of New York, New York, argued for appellees. With him on the brief were Garrard R. Beeney and Adam R. Brebner. Of counsel on the brief were Darren B. Schwiebert and Kurt J. Niederluecke, Fredrikson & Byron, P.A., of Minneapolis, Minnesota.

Jeff G. Randall, Skadden, Arps, Slate, Meagher & Flom LLP, of Palo Alto, California, for third-party defendant-appellant. Of counsel were Chuck P. Ebertin, of Palo Alto, California; Albert L. Hogan III, of Chicago, Illinois; and Allan M. Soobert, of Washington, DC.

Appealed from: United States District Court for the District of Minnesota

Judge Donovan W. Frank

# United States Court of Appeals for the Federal Circuit

2009-1208, -1209

IMATION CORP.,

Plaintiff-Appellant,

v.

KONINKLIJKE PHILIPS ELECTRONICS N.V., U.S. PHILIPS CORPORATION,
and PHILIPS ELECTRONICS NORTH AMERICA CORPORATION,

Defendants/Third-Party Plaintiffs-Appellees,

v.

MOSER BAER INDIA LIMITED,

Third-Party Defendant-Appellant,

and

GLOBAL DATA MEDIA FZ-LLC, MBI INTERNATIONAL FZ-LLC,
MBI INTERNATIONAL SERVICES PRIVATE LIMITED,
MBI INDIA MARKETING PRIVATE LIMITED, GLYPHICS MEDIA, INC.,
and MEMOREX INTERNATIONAL, INC.,

Third-Party Defendants.

Appeal from the United States District Court for the District of Minnesota in
case no. 07-CV3668, Judge Donovan W. Frank.

_____

DECIDED:  November 3, 2009

_____

Before BRYSON and GAJARSA, <u>Circuit Judges</u>, and ST. EVE,[*] <u>District Judge</u>.

ST. EVE, <u>District Judge</u>.

Appellants Imation Corporation ("Imation") and Moser Baer India Limited ("Moser Baer," and collectively, "Appellants") appeal from the partial final judgment entered by the United States District Court for the District of Minnesota that granted judgment on the pleadings in favor of Appellees Koninklijke Philips Electronics, N.V. and Philips Electronics North America Corporation (collectively, "Philips"). <u>See</u> <u>Imation Corp. v. Koninklijke Philips Elec. N.V.</u>, Civ. No. 07-3668 (DWF/AJB), 2008 WL 5104742, at *1 (D. Minn. Nov. 26, 2008) ("<u>Rule 12(c) Opinion</u>"). Because the district court erred in holding that two of Imation's subsidiaries are not licensed under the parties' patent license agreement and thus improperly granted judgment on the pleadings, this court reverses the judgment of the district court, orders entry of judgment in favor of Appellants, and remands the case for appropriate further proceedings consistent with this opinion.

## I. BACKGROUND

In 1995, Philips entered into a patent cross-license agreement with Minnesota Mining and Manufacturing Company ("3M") for optical and magneto optical information storage and retrieval technology (the "CLA" or "Agreement"). The Agreement between these sophisticated parties modified on-going royalty rates 3M paid with regard to existing licenses, and granted each party to the Agreement royalty-free, paid-up, nonexclusive cross-licenses to "make, use, import, offer to sell, and sell other products

---

[*] The Honorable Amy J. St. Eve, District Judge, United States District Court for the Northern District of Illinois, sitting by designation.

incorporating optical and magneto-optical information storage and retrieval technology" patented by the other party, for the life of the licensed patents. In 1996, 3M spun-off Imation, and the Agreement continued between Imation and Philips.

## A. The Relevant Terms of the Agreement

In Article 2 of the Agreement, each party granted two licenses (to products and to processes, respectively) to the other party and its subsidiaries.[1] This case involves the scope of Imation's licenses, each of which states in relevant part that Philips "agrees to grant and does hereby grant to [Imation] and its SUBSIDIARIES a personal, non-exclusive, indivisible, nontransferable, irrevocable, worldwide, royalty-free license under PHILIPS LICENSED PATENTS." Each license grant thus relies on several defined terms relevant to this appeal. Article 1 of the Agreement sets forth these definitions. In particular, Article 1, Section 12 of the Agreement articulates a three-part definition of the scope of "Licensed Patents," which includes patents that:

(1) are owned or controlled by the granting party or any of its SUBSIDIARIES such that such party or its SUBSIDIARIES now has or hereafter obtains the right to grant the licenses within the scope of this Agreement;

(2) relate to optical or magneto-optical information storage and retrieval technology; and

(3) have a filing date, or claim priority from a date, or are or were entitled to claim priority from a date, on or before the expiration date of this Agreement as set forth in Article 4, herein.

Immediately following Section 12, Section 13 defines "Subsidiary" as "any . . . form of business organization as to which the party now or hereafter has more than a fifty percent (50%) ownership interest." Article 3 provides that the term of the licenses

---

[1] Article 2 of the Agreement further provides in Section 3 for two additional licenses to "READ ONLY OPTICAL MEDIA." The scope of Section 3 is not at issue on this appeal.

granted under Article 2 "shall commence on the effective date of this Agreement and shall continue as to each Licensed Patent for its life." According to Imation, at least one of the patents licensed under Article 2 will not expire until 2020. Article 4 of the Agreement, which contains the expiration date referenced in Section 12(3), states that "[t]he term of this Agreement shall expire on March 1, 2000, except that any patent license which has been granted under ARTICLE 2 shall continue thereafter for the term provided in ARTICLE 3."

Since the expiration of the Agreement on March 1, 2000 (the "expiration date"), Imation has formed or acquired at least two additional subsidiaries. In 2003, Imation formed a joint venture with Moser Baer under the name Global Data Media FZ-LLC ("GDM"). Imation owns 51% of the GDM joint venture and Moser Baer owns 49%. In addition to GDM, Imation acquired Memorex International, Inc. ("Memorex") in 2006, and now possesses at least a 50% ownership interest in Memorex. Both GDM and Memorex are third-party defendants to the underlying case, but neither is a party to this appeal.

## B. The District Court's Rule 12(c) Opinion

Imation brought the underlying declaratory judgment action against Philips in 2007, seeking, among other things, a declaration that GDM and Memorex are licensed "Subsidiaries" under the Agreement. As the parties attached the Agreement to the pleadings, Philips moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The district court granted judgment on the pleadings, holding that: (1) the expiration provision of Article 4 of the Agreement limited license coverage to only those "Subsidiaries" which obtained licenses prior to the expiration date; and (2) GDM

and Memorex do not qualify as "Subsidiaries" under the Agreement because they did not meet the definition of "Subsidiary" prior to the Agreement's expiration date.

The first basis for the district court's decision turns on the language in Article 4, which provides that "the term of this Agreement shall expire on March 1, 2000, except that any patent license which <u>has been granted</u> under Article 2 shall continue thereafter for the term provided in Article 3" (emphasis added). Examining the licenses granted in Article 2, the district court found that because GDM and Memorex "did not become Imation subsidiaries until after the CLA expired, they could not have been granted a license as of the date of the expiration." <u>Rule 12(c) Opinion,</u> at *6.

In so holding, the district court accepted Philips's argument that Article 2 grants multiple licenses over time and that, until the Agreement's expiration in March 2000, licenses arose as new Imation "Subsidiaries" came into being. The district court thus rejected Moser Baer's argument that Article 2 effected a present license grant to a group of "Subsidiaries," the membership of which could change at any point during the term of the license:

> Moser Baer asserts that Philips granted a single license to a group of licensees comprised of Imation and its subsidiaries, including subsidiaries formed after March 1, 2000. The assertion of a "group license" is incompatible with the language of the CLA, which, despite its reference to a singular license in Article 2, section 2, plainly contemplates the grant of multiple "personal" licenses.

<u>Id.</u> at *6 n.5. In support of this holding, the district court pointed to the heading of Article 2, "Grant of Royalty Free Licenses," and the reference in Article 3 to "[t]he term of the licenses granted under Article 2." <u>Id.</u>

The second basis articulated by the district court rests on the defined term "Subsidiary." The district court held that the term "Subsidiary"—defined in Article 1,

Section 13 to include any "business organization as to which the party now or hereafter has more than a fifty percent (50%) ownership interest"—excludes companies that were not Imation subsidiaries prior to March 1, 2000. Id. at \*7. Specifically, the district court held that the phrase "now or hereafter" in Section 13 "refers to any time up until the expiration of the agreement" because the "expiration provision applies to the CLA as a whole." Id. at \*6–7. The district court thus rejected Imation's argument, based on the term "hereafter" and the absence of any reference to the Agreement's expiration, that the "Subsidiary" definition contains no temporal limitation that would preclude GDM and Memorex from qualifying as "Subsidiaries."

Following its Rule 12(c) opinion, the district court granted Imation and Moser Baer's motion for certification of a partial final judgment under Rule 54(b) as to Imation's Counts III and IV and Philip's first counterclaim, and this appeal followed. Because Imation's declaratory judgment complaint includes claims for noninfringement, invalidity, and unenforceability of the patents allegedly covered under the CLA, this court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

In reviewing a grant of judgment on the pleadings, this court applies the procedural law of the regional circuit. See Rentrop v. Spectranetics Corp., 550 F.3d 1112, 1118 (Fed. Cir. 2008) ("The Federal Circuit defers to the law of the regional circuits on matters of procedural law that do not implicate issues of patent law." (internal quotation marks omitted)). Accordingly, this court reviews the district court's decision without deference. Ashley County v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009) ("We review the district court's dismissal [under Rule 12(c)] de novo."); Wishnatsky v.

Rovner, 433 F.3d 608, 610 (8th Cir. 2006) (same).  As the Agreement provides that it shall be "construed, governed, interpreted and applied in accordance with the laws of the State of New York," and as the parties do not dispute that New York law governs the Agreement, this court will apply New York substantive law in interpreting the Agreement.  See Parental Guide of Texas, Inc. v. Thomson, Inc., 446 F.3d 1265, 1269 (Fed. Cir. 2006); see also Power Lift, Inc. v. Weatherford Nipple-Up Sys., Inc., 871 F.2d 1082, 1085 (Fed. Cir. 1989) ("A license agreement is a contract governed by ordinary principles of state contract law.").

## A.   Contract Interpretation Under New York Law

Under New York law, "[c]onstruction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms."  Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 324, 834 N.Y.S.2d 44, 47–48, 865 N.E.2d 1210, 1213–14 (2007).  New York courts construe contracts "so as to give full meaning and effect to the material provisions," mindful that a proper "reading of the contract should not render any portion meaningless."  Id.  "Further, a contract should be 'read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'"  Id. (quoting Westmoreland Coal Co. v. Entech, Inc., 100 N.Y.2d 352, 358, 763 N.Y.S.2d 525, 794 N.E.2d 667, 670 (2003)).  With this guidance in mind, we consider the plain language of the Agreement.

## B.   The License Grant

Underlying both the district court's Rule 12(c) opinion and the instant appeal is the issue of whether the court should construe each of the Agreement's license grants

as a single, unitary grant of a license or an agreement to grant multiple licenses over time. Philips maintains that the language in Article 2, which states that "Philips agrees to grant and does hereby grant," is a grant of multiple licenses over time. In other words, Philips contends that "each party grants some licenses at the time of execution ('does hereby grant') and some in the future ('agrees to grant')," Appellees' Br. 23, as new patents or Subsidiaries come into existence. Under this theory, which the district court adopted, the time frame during which additional licenses may be granted closes with the expiration date, and licenses that "had been granted" prior to the expiration date, pursuant to Article 4, would continue for the life of the licensed patents. Appellants, on the other hand, argue that Article 2 effects a present grant to Imation and its Subsidiaries as a group—and the term of these licenses is the life of the licensed patents. Under this logic, once GDM and Memorex became "Subsidiaries," as defined in the Agreement, they automatically received the benefits of the group licenses granted to all Imation "Subsidiaries." Consequently, this court must interpret the license grants in Article 2, and specifically the language that "Philips agrees to grant and does hereby grant."

Although New York courts do not seem to have addressed language similar to that in Article 2, this court has considered similar "agrees to grant and does hereby grant" language in the context of patent assignments. The assignment provision in Filmtec Corp. v. Allied-Signal Inc., 939 F.2d 1568, 1570 (Fed. Cir. 1991), for example, provided that the assignor "agrees to grant and does hereby grant to the Government the full and entire domestic right, title and interest in . . . any invention . . . made in the course of or under this contract." This court held that this language effected a present

assignment of rights in future inventions—and thus a valid assignment of legal title to an invention:

> [T]he contract between MRI and the Government did not merely obligate MRI to grant future rights, but expressly granted to the Government MRI's rights in any future invention. Ordinarily, no further act would be required once an invention came into being; the transfer of title would occur by operation of law.

Id. at 1573. More recently, this court again considered "agrees to and does hereby grant" language and reaffirmed the FilmTec holding. See DDB Tech., L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 (Fed. Cir. 2008) ("If the contract expressly grants rights in future inventions, 'no further act [is] required once an invention [comes] into being,' and 'the transfer of title [occurs] by operation of law.'" (quoting FilmTec, 939 F.2d at 1573)). Philips nonetheless argues that the FilmTec line of cases stands for the proposition that any assignment of an invention made prior to the existence of the invention grants only an expectant interest—an equitable title. This court disagrees. Both FilmTec and DDB distinguished "[c]ontracts that merely obligate the inventor to grant rights in the future," DDB, 517 F.3d at 1290, from an express grant of rights in future inventions, and held that "agrees to grant and does hereby grant" constitutes a present grant of rights—albeit to future inventions, but nonetheless a present grant—that vests immediately. Id.; FilmTec, 939 F.2d at 1573.[2]

---

[2] This view accords with other precedent in this Circuit. See Heidelberg Harris, Inc. v. Loebach, 145 F.3d 1454, 1459 (Fed. Cir. 1998) ("The agreement uses the present tense ('hereby grants') to refer to the grant of both licenses, which creates the inference that both licenses vested immediately."), not followed on other grounds by Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp., 284 F.3d 1323, 1328 (Fed. Cir. 2002). Heidelberg Harris is not a perfect analogy because the agreement in that case involved two distinct licensing periods: a conditional license for a seven-year period and a subsequent unrestricted license. This court held that there was no condition precedent that prevented the vesting of the unrestricted license and so both licenses

Applied to this case, each of the Article 2 licenses in which Philips "agrees to grant and does hereby grant to [Imation] and its SUBSIDIARIES a personal, non-exclusive, indivisible, nontransferable, irrevocable, worldwide, royalty-free license" is a singular, <u>present</u> grant to a class composed of Imation and its Subsidiaries of rights to existing and future patents that fall within the definition of "Licensed Patents" (emphasis added). As discussed above, "Licensed Patents" includes patents filed after the expiration date as long as they claim priority to a date on or before the expiration date. As of the effective date of the Agreement, each license to Imation and its Subsidiaries vested immediately, and thus the licenses "had been granted" prior to the expiration date, pursuant to Article 4. As discussed in the next section, the unambiguous language of the "Subsidiary" definition allows class membership to grow (or shrink) over time, and so the non-existence of GDM and Memorex at the time of the license grant did not prevent either entity from receiving the benefits of the fully vested licenses.

The district court's basis for rejecting the "group license" argument was that it was "incompatible with the language of the CLA, which . . . plainly contemplates the grant of multiple 'personal' licenses." <u>Rule 12(c) Opinion</u>, at *6 n.5. In so holding, the district court cited the plural "licenses" in the heading of Article 2, "Grant of Royalty-Free Licenses," and the language in Article 3 that states, "[t]he term of the <u>licenses</u> granted under Article 2." <u>Id.</u> (emphasis added). The cited language does not resolve the issue, however, because Article 2 includes at least four separate license grants: two to

---

vested immediately, even though the unrestricted license was not immediately operative. 145 F.3d at 1459.

Imation and its Subsidiaries, and two to Philips and its Subsidiaries. The Article 2 heading refers to these licenses.[3]

Philips further disputes the application of the "group license" construction adopted by this court because it conflicts with Article 2's description of the licenses as "personal." Relying on an Eighth Circuit case from 1948, Philips thus argues that "personal" means that the licenses are "unique to the individual grantee." Appellees' Br. 21 (citing Rock-Ola Mfg. Corp. v. Filben Mfg. Co., 168 F.2d 919, 922 (8th Cir. 1948).) Article 2 uses "personal" in its property context, however, and refers merely to the absence of a property right. See, e.g., Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp., 351 F.3d 1139, 1147 (Fed. Cir. 2003) ("[A] non-exclusive licensee of a patent has only a personal and not a property interest in the patent." (quoting In re CFLC, Inc., 89 F.3d 673, 679 (9th Cir. 1996)); Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp., 284 F.3d 1323, 1328 (Fed. Cir. 2002) (recognizing the "need for a uniform national rule that patent licenses are personal and non-transferable in the absence of an agreement authorizing assignment," contrary to the common law rule that contracts are freely assignable). In other words, the licensed parties under the Agreement acquire no ownership right in the licensed patents that would allow the licensed parties to transfer rights to third parties or to confer standing to sue for infringement. Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc., 248 F.3d 1333, 1345 (Fed. Cir. 2001) ("[A] nonexclusive license . . . confers no constitutional standing on the licensee under the Patent Act to bring suit or even to join a suit with the patentee because a nonexclusive

---

[3] Regardless, this court is unwilling to resolve a pivotal issue of contract interpretation based on the tense of section headings where doing so would conflict with the plain reading of operative language elsewhere in the contract.

(or 'bare') licensee suffers no legal injury from infringement."). Instead, as licensees, they acquire the right not to be sued by Philips for infringement:

> [A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee. Even if couched in terms of '[l]icensee is given the right to make, use, or sell X,' the agreement cannot convey that absolute right because not even the patentee of X is given that right. His right is merely one to exclude others from making, using or selling X. Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents. In any event, patent license agreements can be written to convey different scopes of promises not to sue, e.g., a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future.

TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d 1271, 1275–76 (Fed. Cir. 2009) (quoting Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1081 (Fed. Cir. 1987)).

Philips' contention that each Article 2 license grant is a grant of multiple licenses over time also conflicts with the plain language of Article 2's use of the singular form of "license." In addition, the plain language of Article 3 provides that the term of the licenses granted under Article 2 "shall commence on the effective date of this Agreement." If Article 2 granted multiple licenses over time, then Article 3 likely would have provided a method of determining multiple dates of commencement based on later-filed patents and/or later-acquired Subsidiaries, rather than a single commencement date for each unitary license granted to each party's class of entities. Article 2 thus grants two licenses to the collective group of Imation and a class of entities that meet the definition of Subsidiary in Section 13. As each license existed prior to the March 1, 2000 expiration date, GDM and Memorex may claim the benefits of each license as long as they each qualify as an Imation "Subsidiary."

## C.    The Definition of "Subsidiary"

The district court also found that GDM and Memorex do not qualify as Subsidiaries under the Agreement because they came into existence after the expiration date.  The district court imported the expiration date into the Section 13 definition of "Subsidiary" and thus held that the expiration date in Article 4 applied to every provision of the Agreement.  Appellants argue that the "Subsidiary" definition is not limited by the expiration date and does not prevent subsidiaries acquired or created after the expiration date from receiving the benefits of the licenses.  In support of their interpretation, Appellants argue that:  (1) the use of the phrase "now or hereafter" in the "Subsidiary" definition precludes an implicit, temporal limitation; and (2) the lack of a reference to the Agreement's expiration clause supports that the parties intentionally did not include the limitation.

### 1.    The Agreement's Unambiguous Use of "Subsidiary"

Looking to the plain language of the "Subsidiary" definition, the use of the phrase "now or hereafter" connotes that Subsidiaries may come into existence at some unspecified future time.  The parties defined Subsidiary as a business organization "as to which the party now or hereafter has more than a fifty percent (50%) ownership interest."  Merriam Webster's Collegiate Dictionary defines "hereafter" to mean "after this in sequence or in time" or "in some future time or state."  Merriam Webster's Collegiate Dictionary 542 (10th ed. 1996).[4]  Had the parties chosen to limit a Subsidiary

---

[4]    New York courts commonly refer to dictionaries to determine the plain meaning of words and phrases.  See Bianco v. Bianco, 36 A.D.3d 490, 491, 830 N.Y.S.2d 21, 23 (App. Div. 2007) ("Words and phrases used in an agreement must be given their plain meaning, and it is common practice for courts to refer to the dictionary in determining plain meaning.").

to those in existence at the time of execution, the parties could have omitted "or hereafter" in favor of "now"—or they could have simply listed the relevant subsidiaries then in existence. The use of "hereafter" thus compels the conclusion that "Subsidiary" includes entities in which the parties did not own 50% at the time of execution but in which they later acquired at least a 50% ownership interest at some point following the Agreement's effective date. The plain language of Section 13 contains no explicit temporal limitation, and this court is "extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 767–68, 807 N.E.2d 876, 879 (2004).

Further, the absence of a temporal limitation in the Section 13 "Subsidiary" definition is especially apparent when compared to the Section 12 "Licensed Patents" definition that immediately precedes "Subsidiary" in the Agreement. Unlike the "Subsidiary" definition, the "Licensed Patents" definition explicitly references the Agreement's expiration date. Where one provision of an agreement contains a particular reference, the omission of this reference from any similar provision "must be assumed to have been intentional under accepted canons of contract construction." U.S. Fid. & Guar. Co. v. Annunziata, 67 N.Y.2d 229, 233, 501 N.Y.S.2d 790, 792, 492 N.E.2d 1206, 1208 (1986); see also Sterling Investor Servs., Inc. v. 1155 Nobo Assoc., L.L.C., 30 A.D.3d 579, 581, 818 N.Y.S.2d 513, 516 (App. Div. 2006). Although the parties could have referenced the expiration date in the definition of "Subsidiary," they did not.

The three-part "Licensed Patents" definition indicates that the parties wanted the licenses to include later-filed or acquired patents. Rather than a static list of patents, the parties drafted three criteria that determine the scope of "Licensed Patents." This "pool" of patents is limited by: (1) ownership, in Section 12(1); (2) relevant technology, in Section 12(2); and (3) filing and/or priority date, in Section 12(3). Each subsection adds a separate criterion, but only Section 12(3) references the expiration date explicitly. The parties could have referenced the expiration date in the preamble of Section 12, to modify all subparts equally, or they could have chosen to omit the reference from Section 12(3), to make clear, based on parallelism, that the expiration date applied to each subpart in the same way.[5]

Applying the district court's logic, the expiration clause must be imported into Sections 12(1), 12(2), and 12(3), as well. Reading the expiration date into each subpart of Section 12, however, improperly limits Section 12(1) to only those patents and applications owned or controlled by the parties prior to the expiration date—thus excluding any patents filed after March 1, 2000, but claiming priority to pre-March 1, 2000 applications.[6] As a result, even if Imation filed (or acquired) a patent on March 2, 2000, that was absolutely crucial to Philips's products, Philips would not receive the benefit of that patent—even if the patent had a pre-2000 priority date, as required by Section 12(3) and otherwise met the technology limitation of Section 12(2). Even

---

[5] The absence of an explicit reference in Section 12(3) would support the district court's interpretation that the expiration date limits each definition in the Agreement.

[6] This is precisely what the district court found. Rule 12(c) Opinion, at *9 ("Based on the language of section 12(1), and in light of the CLA's general expiration provision, the Court concludes that a patent must have been 'owned or controlled' by a granting party or a subsidiary as of March 1, 2001.").

Philips rejects this result, however, because Philips interprets the "Licensed Patents" definition as including patents and applications filed after the Agreement's March 1, 2000 expiration: "'[L]icensed patents' includes not only patents issued on applications filed prior to expiration, but also those issued on later filed applications having priority dates prior to expiration." Appellees' Br. 38 n.16 (noting by example "a post-March 1, 2000 application claiming pre-March 1, 2000 priority to a foreign application").

In addition, importing the expiration date into Section 12(1) renders Section 12(3) superfluous because any patent or application that met the ownership limitation in Section 12(1) as of the expiration date necessarily had a "filing date, or claim[ed] priority from a date" on or before the expiration date. Under this interpretation, Section 12(3)'s priority date limitation—and its explicit reference to the expiration date—serves no purpose. The expiration date thus cannot implicitly apply to Section 12(1) because New York law forbids any interpretation that renders language in the agreement superfluous. <u>Lawyers' Fund for Client Prot. v. Bank Leumi Trust Co.</u>, 94 N.Y.2d 398, 404, 706 N.Y.S.2d 66, 69, 727 N.E.2d 563, 566 (2000).[7]

### 2. The Plain Meaning of "Hereafter"

Section 12(1), like Section 13, relies on the term "hereafter" to convey the lack of a temporal limitation. This consistent usage reinforces the interpretation that neither

---

[7] The district court reversed this logic, holding that Section 12(3) was not superfluous because "[e]ven though a patent might satisfy section 12(3) by having a filing or priority date preceding March 1, 2000, it might not satisfy section 12(1) if, for example, it was not acquired until after the general expiration provision . . . both sections 12(2) and 12(3) further define those patents that satisfy section 12(1)." <u>Rule 12(c) Opinion</u>, at *9 n.8. This <u>ex post facto</u> interpretation ignores that the three criteria enumerated in Section 12 are drafted in the conjunctive, and so a given patent must meet all three criteria before it qualifies as a "Licensed Patent." Regardless, Section 12(3) already references the expiration date explicitly—importing the expiration date into Section 12(3) is, at a minimum, redundant.

section contains a temporal limitation. A proper interpretation of a contract generally assumes consistent usage of terms throughout the Agreement. Finest Inv. v. Sec. Trust Co. of Rochester, 96 A.D.2d 227, 230, 468 N.Y.S.2d 256, 258 (App. Div. 1983), aff'd, 61 N.Y.2d 897, 474 N.Y.S.2d 481, 462 N.E.2d 1199 (1984) (New York courts "presume that the same words used in different parts of a writing have the same meaning.").

Philips responds that Imation's reading of "hereafter" is too expansive because it would allow subsidiaries to acquire licenses beyond the term of the Agreement. Setting aside the inconsistency in Philips' logic—because, as Philips admits, patents filed after the expiration date may still qualify as "Licensed Patents"—Philips does not address the plain meaning of "hereafter" and instead relies, as did the district court, on nonbinding precedent involving insurance contracts. GE Engine Servs. UNC Holding I, Inc. v. Century Indem. Co., 250 F. Supp. 2d 1237 (C.D. Cal. 2001), for example, interpreted a "Named Insured" provision that included subsidiaries that "are owned or financially controlled . . . as now exist or hereafter constituted." Id. at 1242 (emphasis in original). Applying California law, the GE Engine court held that the insurance policy period necessarily limited the covered subsidiaries because "the policy period is an essential element of a liability insurance contract which must be taken into consideration when looking at the policy as a whole." Id. This holding makes sense in the context of occurrence-based insurance coverage, where the coverage ends with the policy period—it would be absurd to require an insurer to cover an occurrence falling within a particular policy period where the primary insured did not acquire the subsidiary until after the policy had expired. Occurrence-based insurance polices are a poor analog for patent license agreements, however, because licenses do not necessarily run

concurrently with agreements. Indeed, the licenses granted here do not terminate with the Agreement's expiration but rather extend for the life of each relevant patent. As the parties clearly contemplated receiving the benefits of the licenses for the life of each licensed patent, there is no reason to deny this benefit to the Subsidiaries formed or acquired after the Agreement's expiration. In addition, the "Subsidiary" definition here differs from that considered by the GE Engine court because the definition here includes an additional 50% ownership requirement. As a result, Imation subsidiaries are licensed only as long as Imation retains a 50% ownership interest in them—thus preventing the bizarre result of Imation acquiring a subsidiary in 2001 and retroactively immunizing pre-2000 sales.

A plain reading of the Agreement as a harmonious, integrated whole, as New York law requires, Westmoreland Coal, 100 N.Y.2d at 358, 763 N.Y.S.2d at 528, 794 N.E.2d at 670, establishes that these sophisticated parties created broad cross-licenses that enabled the parties to operate in a given area of technology, free of the risk that the other party would threaten infringement. To make this possible, the parties constructed licenses with a fluid scope that grew with the acquisition of additional patent rights and a fluid membership that changed as the parties—sophisticated corporations operating throughout the world—changed their corporate structures. The court thus holds that the licenses granted by the Agreement extend to any subsidiary of either Imation or Philips that otherwise meets the "Subsidiary" definition of Article 1, Section 13, regardless of when Imation or Philips acquired or formed that subsidiary.

### III. CONCLUSION

Because the district court erred in finding that Imation subsidiaries GDM and Memorex are not licensed under the Agreement, and because the unambiguous Agreement makes clear that the license grant includes subsidiaries of Imation and Philips that meet the Agreement's "Subsidiary" definition, the court reverses the underlying Rule 54(b) judgment, orders entry of judgment in favor of Imation on Counts III and IV of the Complaint and in favor of Appellants on Philip's first counterclaim, and remands for appropriate further proceedings consistent with this opinion.

<u>REVERSED AND REMANDED</u>.