[53 NYS3d 284]

New York University, Appellant, v Pfizer Inc., Respondent.

First Department, May 2, 2017

### APPEARANCES OF COUNSEL

*Lerner David Littenberg Krumholz & Mentlik LLP*, West-field, NJ (*Stephen F. Roth* of the New Jersey bar, admitted pro hac vice, of counsel), and *Kramer Levin Naftalis & Frankel LLP*, New York City (*Michael S. Oberman* and *Roy H. Wepner* of counsel), for appellant.

*White & Case LLP*, New York City (*Dimitrios T. Drivas, Christopher J. Glancy, Gregory Little* and *Robert Counihan* of counsel), for respondent.

### OPINION OF THE COURT

ANDRIAS, J.

In this action for breach of contract, plaintiff, New York University (NYU), seeks to recover from defendant, Pfizer, Inc., as the successor in interest to Sugen, Inc., royalties on the sale of the cancer treatment drug, Xalkori®. Xalkori®, a tyrosine kinase receptor (TKR) inhibitor, was approved by the Food and Drug Administration (FDA) in 2011 to target the chemical receptor EML4-ALK, which was discovered by Japanese scientists after Sugen's ownership changed and its research project with NYU had ended. NYU alleges that it is neverthe-

less entitled to royalties under section 9 of the governing Second Amended Research and License Agreement because Xalkori®'s active ingredient, a small molecule inhibitor drug substance named "crizotinib," was derived from its research and "know-how." In the face of the countervailing reasonable interpretations presented by the parties, which cannot be resolved at this procedural stage, we find that the language in section 9 delineating whether NYU is entitled to royalties under these circumstances is ambiguous, and that the motion court erred in granting Pfizer's motion to dismiss the complaint (*see U.S. Bank N.A. v Lightstone Holdings LLC*, 103 AD3d 458, 459 [1st Dept 2013]).

Effective as of September 1, 1991, Sugen agreed to sponsor NYU's research into TKRs in human cells, disorders of which are causative factors for many life-threatening cancers. The goal was to understand the mechanisms underlying the actions of TKRs and how they can be regulated, with NYU, among other things, "to determine the three dimensional structure of the protein tyrosine kinase domain in complex with inhibitors using x-ray crystallography." In return, Sugen received an exclusive worldwide license to use NYU's "Research Technology" for the development, manufacture, use, and sale of drugs that would inhibit TKRs, with Sugen agreeing to pay NYU certain royalties on sales of those drugs.

NYU's research technology included the determination of a three-dimensional crystal structure of the tyrosine kinase domain of the FGFR1, which enabled Sugen to systematically design and efficiently test candidate small molecule compounds as TKR inhibitors. NYU alleges that relying on this "pioneering technology," Sugen decided to pursue small-molecule inhibitors of the "c-Met" receptor, leading to the development of the chemical structure of "SU11274," which was later optimized by Sugen to generate "PHA-665752."

In 1996, in contemplation of Sugen being acquired by a third party, the parties executed the Second Amended Research and Licensing Agreement. Towards that end, NYU agreed to reduce the royalty rates then due in exchange for the right to royalties on certain later developed products, and the parties added section 9, captioned "SUGEN Ownership Change," which states:

> "[1] In the event that SUGEN is acquired or merged with another company, or that SUGEN acquires or forms a joint venture with another company, then SUGEN may at its option notify NYU that such

other company wishes to make a determination as to which targets shall be included under the terms of the Agreement prior to the effective date of any such acquisition, merger, or joint venture, or as soon as possible thereafter. This determination shall be made in good faith by NYU and SUGEN and shall be based on an examination of SUGEN's lab books and other information available to the parties, full access (under appropriate confidentiality agreements) to which will be provided to NYU.

"[2] With respect to targets that were adopted by SUGEN into drug discovery prior to the effective date of the acquisition, merger, or joint venture, SUGEN Products developed based on such targets shall be subject to the license payments described in Section 8 hereto.

"[3] SUGEN Products that are developed based on Receptor targets which were not adopted into drug discovery at the time of the effective date of such acquisition, merger, or joint venture shall be subject to a). a royalty of 2.5% on Net Sales of SUGEN, and/or Corporation Entity, which may be offset by 50% of the royalties paid by SUGEN to third parties (other than MPG), provided that the royalties due to NYU shall not be less than 1.5% of Net Sales of SUGEN and/or Corporation Entity and b). 10% of License Revenues with respect to any SUGEN Product, provided that with respect to such SUGEN Product there exists a Patentable Invention with respect to such target and/or its utility which is derived from or based on the Research Technology, and provided further that such SUGEN Product shall include a product irrespective of whether an IND application is filed with respect thereto within 4 years from the end of the Research Period, or not."

Sugen was acquired by Pharmacia in 1999. Pharmacia was acquired by Pfizer in 2003. Pfizer then optimized PHA-665752 to develop crizotinib (PF-02341066), and, on December 12, 2005, filed an IND application (a request for authorization from the FDA to administer an investigational drug to humans) for the drug substance as an inhibitor of the c-Met receptor. NYU alleges that information and direction from its drug

discovery process led to the design of crizotinib, which was developed from studying and comparing the binding of Sugen's various candidate compounds in complex with the FGFR1 kinase crystals, with c-Met homology models derived from NYU's FGFR1 kinase crystals, and later in complex with a c-Met kinase crystal.

In 2007, EML4-ALK, a mutated form of the "ALK" TKR, was discovered by researchers at a Japanese university unaffiliated with NYU or Pfizer as a cause of non-small cell lung cancer (NSCLC) in a subset of patients. After it determined that crizotinib inhibited the EML4-ALK receptor, Pfizer amended its IND for crizotinib to include clinical studies of lung cancer patients who tested positive for the EML4-ALK receptor. In August 2011, the FDA approved the drug, which Pfizer named Xalkori®. After Pfizer rejected NYU's demand for royalties on sales of Xalkori®, NYU commenced this action.

The dissent finds that because crizotinib was developed based on the receptor c-Met, which was adopted by Sugen into drug discovery, any product based on that patentable invention, including Xalkori®, is subject to the royalty provisions of section 8, which are inapplicable because no IND was filed within four years of the end of the Research Period. However, while crizotinib has a nexus to c-Met, the language employed in section 9 does not preclude the finding that crizotinib (and the patents derived from it) also has a relevant nexus to EML4-ALK. Section 9 (2) provides that "[w]ith respect to targets that were adopted by SUGEN into drug discovery prior to the effective date of the [change in ownership], SUGEN *Products developed based on such targets* shall be subject to the license payments described in Section 8 hereto" (emphasis added). Although c-Met was adopted into discovery before Sugen was acquired, the Sugen product, Xalkori®, is based on the target EML4-ALK, not c-Met. Thus, we must consider whether NYU is entitled to royalties under section 9 (3).

Whether NYU is entitled to royalties under section 9 (3) turns on the meaning of the language entitling NYU to royalties on

> "SUGEN Products that are developed based on Receptor targets which were not adopted into drug discovery at the time of the effective date of [Sugen's change in ownership] . . . , provided that with respect to such SUGEN Product there exists a

Patentable Invention with respect to such target and/or its utility which is derived from or based on the Research Technology."

Adopting Pfizer's interpretation that "and/or its utility" is a modifier of "such target," the dissent finds that the only commercially reasonable way to interpret section 9 (3) is that the "Patentable Invention" must be related to the "target," which must have been identified as part of the NYU research project prior to the change in ownership, and not to the drug substance found to inhibit the target. Thus, the dissent finds that NYU is not entitled to royalties because Xalkori® was not "derived from or based on the Research Technology" since EML4-ALK and its utility (namely, its association with NSCLC) were discovered by Japanese researchers without benefit of NYU's research technology, and Pfizer did not rely on NYU's confidential information or know-how to discover that crizotinib was an effective EML4-ALK inhibitor.

Although this may be one reasonable interpretation of section 9 (3), the disputed language "on its face is reasonably susceptible of more than one interpretation" (*Chimart Assoc. v Paul*, 66 NY2d 570, 573 [1986]; *see also Duane Reade, Inc. v Cardtronics, LP*, 54 AD3d 137, 144 [1st Dept 2008]). The phrase "provided that with respect to such SUGEN Product there exists a Patentable Invention with respect to such target and/or its utility which is derived from or based on [NYU's] Research Technology," implies that the nexus between the invention and the target need not be direct. It does not require Patentable Inventions on a target per se—which, NYU argues, would be a legally impossible requirement, since a target is an unpatentable product. Thus, the phrase may be reasonably interpreted to provide that any "Sugen Product" containing a "Patentable Invention," "derived" in part through NYU's "Research Technology," may be the source of royalty payments. Xalkori® is a Sugen product, developed based on the use of a "patentable invention," crizotinib, which was developed using NYU's know-how (e.g., X-ray crystallography), "with respect to" the "non-adopted" receptor, ELM4-ALK. In other words, Pfizer's patents on crizotinib have the requisite nexus to the "utility" of the EML4-ALK receptor because Xalkori® is FDA approved only to target that receptor.

To the extent Pfizer, on its own, discovered that crizotinib could treat ELM4-ALK, the discovery of crizotinib was still derived in part through NYU's research technology. Further,

nothing in the plain language of section 9 (3) can be read to require that the section only applies to sales of a drug treating a "non-adopted target" discovered by NYU prior to the ownership change or that NYU was obligated to discover the target based on its know-how. In contrast, section 11 of the 1996 Agreement, the only other section that discusses targets, refers to targets "identified directly by NYU in the course of the NYU Research Project," which can become "Validated Targets." As NYU argues, this shows that when the parties wished to limit the applicability of a section of the 1996 Agreement to targets "identified directly by NYU," they knew how to do so.

Thus, because section 9's language delineating when Pfizer owes NYU royalties with respect to non-adopted targets is ambiguous, we cannot determine on this motion to dismiss that either party's interpretation of the agreement controls as a matter of law.

The dissent's contention that NYU's reading would lead to a commercially unreasonable result because it would obligate Pfizer to pay "a royalty on any drug that targets any receptor that is discovered at any time by anyone," does not withstand scrutiny. NYU's reading reflects the commercially reasonable bargain between NYU and Sugen to reduce NYU's royalties in the short term in exchange for a royalty on certain future products developed by Sugen's successor, even with respect to targets discovered by third parties, as long as the products were based on or derived from NYU technology. Absent that connection, no royalties would be due.

Accordingly, the judgment of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered February 8, 2016, dismissing the complaint, and bringing up for review an order of the same court and Justice, entered December 21, 2015, which granted defendant's motion to dismiss, should be reversed, on the law, without costs, the judgment vacated, the motion denied, and the complaint reinstated.

MOSKOWITZ, J. (dissenting). I disagree with the majority that the disputed language is susceptible of more than one interpretation. Rather, I believe that the language in section 9 is unambiguous, and therefore, that the motion court properly dismissed the complaint because NYU is not entitled to royalty payments on the sale of Xalkori®. Therefore, I respectfully dissent.

In 1990, plaintiff New York University (NYU) hired an expert in research relating to tyrosine kinase receptors (TKRs) to serve as chairman of NYU's Department of Pharmacology.* In the 1990s, the chairman and his team pioneered research into TKRs and made critical discoveries in targeted cancer therapy, which involves making drugs that attach to and inhibit, or target, specific receptors causing cancer, thereby targeting only cancerous cells while leaving healthy cells unaffected. In 1991, while an NYU employee, the chairman co-formed nonparty Sugen, Inc., a drug discovery company located in California, to help with the design of drug compounds.

In August 1991, NYU and Sugen entered into a license agreement in which Sugen agreed to sponsor and fund a multiyear "NYU research project" in the field of certain "receptors," including tyrosine kinases, believed to be useful in the development of drugs to treat cancer. In return, Sugen received an exclusive worldwide license to use NYU's "Research Technology" (NYU "patents and NYU Know-How") for the development, manufacture, use, and sale of drugs that would inhibit any receptor that acts directly or indirectly through tyrosine kinase activity; Sugen agreed to pay NYU certain royalties on sales of those drugs. "NYU Know-How" is defined in the relevant agreement as preexisting inventions and any information and materials discovered, developed, or acquired in the course of the NYU Research Project.

In 1996, in anticipation of Sugen's acquisition by another company, the parties amended the agreement to extend the NYU research project to September 2001 and to adjust the royalty payments. In earlier versions of the agreement, all of the royalty obligations had been set forth in section 8. In the 1996 agreement, however, NYU's rights under section 8 were restricted to a specified time frame and the parties added a new section 9, entitled "SUGEN Ownership Change." Section 9 set forth a completely new royalty-bearing category of Sugen products; the new category was not limited to the time frame specified in section 8.

As relevant here, section 9 stated that if another company acquired Sugen, or if Sugen merged or entered into a joint venture with another company, Sugen was empowered to notify NYU that the other company wanted to determine which targets would be included under the terms of the agreement. NYU and Sugen would then jointly, before the effective date of

---

* TKRs are enzymes in human cells; mutations or defects in TKRs can lead to cancer and other diseases.

the ownership change, make the determination "based on . . . SUGEN's lab [note]books and other information available to the parties." Section 9 of the 1996 agreement then provided that, "[w]ith respect to targets that were adopted by SUGEN into drug discovery prior to the effective date" (that is, "adopted targets") of the ownership change, Sugen products developed based on those targets were to be subject to the license payments described in section 8. "SUGEN products," in turn, referred to drugs developed in the research involving TKRs based on adopted targets. According to sections 8 and 9, the Sugen owner would pay the royalty only if the drug's Investigational New Drug application (IND) was filed with the FDA "within four years from the end of the Research Period" (that is, before September 2005).

By contrast, the "change-of-control" provision of section 9 provided that Sugen products based on receptor targets that were not adopted into drug discovery before the ownership change (that is, "non-adopted targets") were subject to a different set of royalty payments. Specifically, the royalty payments would be different for non-adopted targets "provided that with respect to such SUGEN Product there exists a Patentable Invention with respect to such target and/or its utility which is derived from or based on" NYU's Research Technology, and regardless of whether an IND application with respect to the product was filed within four years of the end of the Research Period. A "Patentable Invention" is a claim in an issued, valid, unexpired patent or a claim in a pending patent application.

Sometime in 1996, during the Research Period, Sugen "adopted" the target "c-Met" into drug discovery (that is, began to develop drugs targeting c-Met). The related research led to the creation of a substance called crizotinib, a small molecule inhibitor that was able to inhibit multiple targets, including c-Met.

In 1999, Pharmacia acquired Sugen, and in 2003, Pfizer acquired Pharmacia. On December 12, 2005, more than four years after the Research Period ended, Pfizer filed an IND application for crizotinib; the application listed c-Met among the target receptors for this compound.

In 2007, Japanese scientists discovered a new target—EML4-ALK, a mutated form of the so-called "ALK" TKR receptor—and found that it causes non-small cell lung cancer (NSCLC) in a subset of patients. Pfizer then amended its IND application relating to crizotinib to include studies of lung can-

cer patients who tested positive for the newly recognized EML4-ALK receptor, and this receptor became a new target receptor, with crizotinib the subject of a new drug discovery program for treating NSCLC. After Pfizer studies determined that crizotinib would inhibit the EML4-ALK receptor, Pfizer began to develop crizotinib into what would ultimately become Xalkori®, a drug later approved by the FDA for use with patients having metastatic NSCLC and who are tested as being "anaplastic lymphoma kinase (ALK) positive."

In January 2015, NYU sued Pfizer, alleging that it had failed to comply with section 9 of the 1996 Agreement, which, according to NYU, required Pfizer to pay NYU a royalty on Pfizer's sales of Xalkori®. Specifically, NYU alleged it was entitled to royalties on sales of Xalkori® because Xalkori® was a Sugen product whose active ingredient was crizotinib, a patentable invention "with respect to" the "non-adopted" receptor target EML4-ALK, based on NYU Know-How.

Pfizer moved to dismiss for failure to state a claim under the 1996 Agreement. On the motion, Pfizer argued that, based on the plain meaning of the 1996 Agreement, crizotinib was developed based on the "adopted target" c-Met, with the result that a product based on that patentable invention, including Xalkori®, was a product subject only to the royalty provisions of section 8. However, Pfizer noted, the section 8 royalty provisions were not applicable here because no IND was filed within four years of the Research Period. Pfizer further asserted that no royalties were due for Xalkori® under section 9, because even though EML4-ALK was a "non-adopted target," crizotinib was based on the "adopted target" c-Met. Likewise, Pfizer argued that the use of crizotinib in Xalkori® with respect to EML4-ALK was not derived from or based on NYU Research Technology, as Pfizer had learned, independent of NYU, that crizotinib could inhibit EML4-ALK and developed Xalkori® for that purpose without use of further NYU Know-How.

The motion court granted the motion to dismiss the complaint, finding that it failed to plead a "Patentable Invention with respect to [EML4-ALK] and/or its utility which is derived from or based on the Research Technology," as section 9 required. On the contrary, the court found, "Xalkori® was not 'derived from or based on the Research Technology' because NYU had nothing to do with Xalkori®'s target, EML4-ALK" (2015 NY Slip Op 32702[U], *13 [2015]). Further, the court noted, under the plain language of the agreement, NYU was

not entitled to royalties for Xalkori® under section 9 because Xalkori® treated EML4-ALK, which Japanese scientists had discovered without the benefit of NYU Know-How.

The court further concluded that section 9 was not ambiguous and that Pfizer's interpretation of the provision was correct. Indeed, the court noted, had the parties intended the agreement to carry NYU's interpretation, they would not have included the phrase "with respect to such target and/or its utility." Here, because the only "Patentable Invention[s]" pleaded in the complaint were Pfizer patents related to crizotinib, and not to the EML4-ALK target or its utility, the complaint failed to allege a "Patentable Invention with respect to such target and/or its utility."

Finally, the motion court concluded that the context of section 9's drafting supported Pfizer's interpretation. Specifically, the court found that the parties added section 9 in contemplation of Sugen's acquisition, to expand the circumstances in which NYU was entitled to a royalty even for products submitted for FDA approval more than four years after the end of the Research Period, but only where the medication targeted a receptor identified as a result of NYU's contributions. The court thus concluded that the only commercially reasonable interpretation of section 9 was that NYU must have contributed to the discovery of Xalkori®'s target.

I agree with the motion court's interpretation of the agreement's language. As is well established in New York law, a contract should be "read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose" (*Beal Sav. Bank v Sommer*, 8 NY3d 318, 324-325 [2007], quoting *Matter of Westmoreland Coal Co. v Entech, Inc.*, 100 NY2d 352, 358 [2003]). As is also well established, "[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable[,] or contrary to the reasonable expectations of the parties" (*Matter of Lipper Holdings v Trident Holdings*, 1 AD3d 170, 171 [1st Dept 2003] [citations omitted]).

Here, I would find that NYU is not entitled to royalties under the plain meaning of the agreement. Xalkori® is not subject to royalties under section 8 of the agreement because Pfizer filed the IND for crizotinib more than four years after the Research Period ended. Furthermore, because crizotinib was developed based on c-Met, a target "adopted by SUGEN into drug discovery prior to the SUGEN ownership change," section 9

requires that Pfizer's royalty obligation is subject to section 8, which, as just noted, does not apply.

I also believe that we should reject NYU's argument that the last clause of section 9, read alone, allows NYU to receive a royalty on sales of Xalkori®. To begin, as the motion court found, the target must have been identified as part of the NYU Research Project. EML4-ALK was not so identified. EML4-ALK and its utility (that is, its association with NSCLC) were discovered by Japanese researchers without the benefit of any NYU Research Technology. Moreover, Pfizer did not rely on any NYU confidential information to discover that crizotinib was an effective EML4-ALK inhibitor. Therefore, NYU cannot plead a "Patentable Invention with respect to [EML4-ALK] and/or its utility which is derived from or based on [NYU's] Research Technology," as section 9 requires.

In addition, as the IAS court found, the "Patentable Invention" must be related to the target or its utility, not to the drug found to inhibit the target. Pfizer's patents, however, relate to the drug crizotinib and not the target EML4-ALK or its utility. Indeed, under its plain meaning, the phrase "Patentable Invention with respect to such target and/or its utility," means that the Patentable Invention concerns the target, not solely the medication that affects the target. Had the parties wished to include drugs and their utilities in the phrase, they surely could have added language that would have done so. Likewise, NYU's interpretation obviates the phrase "with respect to such target and/or its utility," thus rendering that phrase meaningless. Of course, courts will avoid reading a contract so that any part is rendered meaningless (see Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc., 63 NY2d 396, 403 [1984]; GEM Holdco, LLC v Changing World Tech., L.P., 127 AD3d 598, 598 [1st Dept 2015]).

Furthermore, for NYU to receive royalties under section 9, the target must have been identified before the Sugen ownership change. No party disputes that the target EML4-ALK was identified in 2007, eight years after Pharmacia acquired Sugen. Sugen could not have adopted or declined to adopt the target EML4-ALK before Pharmacia acquired it, as Sugen could not have acted on targets that were not even discovered in 1999.

What is more, according to the language of section 9, the "Patentable Invention" must have existed at the time of the Sugen ownership change. As with the identification of the

target before the Sugen ownership change, discussed immediately above, no party disputes that Pfizer filed its patents years after Pharmacia acquired Sugen.

Finally, NYU's interpretation of section 9 would lead to a commercially unreasonable result. Reading the section the way NYU interprets it, Pfizer would owe a royalty on any drug that targets any receptor that is discovered at any time by anyone. This could not be the result that the parties intended.

MAZZARELLI, J.P., and GISCHE, J., concur with ANDRIAS, J.; MOSKOWITZ and GESMER, JJ., dissent in an opinion by MOSKOWITZ, J.

Judgment, Supreme Court, New York County, entered February 8, 2016, and bringing up for review an order, same court and Justice, entered December 21, 2015, reversed, on the law, without costs, the judgment vacated, the motion denied, and the complaint reinstated.